1999 UT 64

**STATE of Utah, Plaintiff and Appellee,**

v.

**Tomas R. HERRERA, Defendant and Appellant.**

No. 980145.

Supreme Court of Utah.

June 29, 1999.

Jan Graham, Att'y Gen., Christine Soltis, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Joan C. Watt, Mark R. Moffat, Richard P. Mauro, Salt Lake City, for defendant.

RUSSON, Justice:

¶ 1 This is the second time this case has come before this court. The first time, Tomas Herrera challenged Utah's insanity defense statute, Utah Code Ann. § 76–2–305(1), as being unconstitutional on its face. We denied Herrera's facial challenges and remanded his case for trial. *See State v. Herrera*, 895 P.2d 359, 363–71 (Utah 1995). After remand, Herrera entered conditional pleas of guilty and mentally ill to two counts of attempted murder. Herrera now appeals his conviction and sentence for those two counts. Herrera contends that the Utah statutes governing both the defense of insanity and the criminal liability of mentally ill offenders who do not qualify for an insanity defense are unconstitutional as applied to him and on their face.

## BACKGROUND

¶2 Shortly after midnight on June 6, 1991, Herrera entered the home of his ex-girlfriend Claudia Martinez. Herrera went into Claudia's bedroom and, after a brief struggle, shot her twice in the head, killing her. As he left Claudia's bedroom, Herrera encountered her mother Rosa in the hallway. Rosa immediately turned and ran into her son's bedroom. Herrera pursued and, once inside the room, shot at Rosa, barely missing her. Herrera then turned to her son Reuben, who was in bed, and said, "Now you're going to go." Herrera fired two shots at Reuben at point-blank range, both of which also missed. Herrera tried again to fire the gun, but it was out of bullets.

¶3 Police officers arrested Herrera soon after the shootings. After waiving his *Miranda* rights, Herrera told the officers that while driving around, something "snapped" within him and he decided to go to the Martinez house and shoot Claudia. Herrera admitted to killing Claudia and shooting at Rosa and Reuben. The State charged Herrera with one count of murder and two counts of attempted murder. *See* Utah Code Ann. §§ 76–5–203, 76–4–101.

¶4 In response to these charges, Herrera pleaded not guilty by reason of insanity. In conjunction with his plea, Herrera challenged the constitutionality of Utah Code Ann. § 76–2–305(1), the statute governing the availability of the insanity defense in Utah, which provides:

> It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.

Utah Code Ann. § 76–2–305(1) (1995). This statute was enacted in 1983. *See* 1983 Utah Laws ch. 49, § 1. It abolished the prior version of Utah's insanity defense, which allowed defendants to avoid criminal liability if, at the time of the proscribed conduct, mental disease or defect prevented them from appreciating the wrongfulness of their actions or conforming their conduct to the law. *See* 1973 Utah Laws ch. 196, § 76–2–305. Herrera asserted that since revised section 76–2–305 permits a defense of insanity only when defendants lacked the mental state required as an element of the offense charged (the "mens rea" of the crime [1]), the statute is facially unconstitutional [2] because it (1) violates due process, (2) improperly relieves the prosecution of its burden of proof, (3) runs afoul of equal protection, and (4) violates restrictions against cruel and unusual punishment. In addition, Herrera argued that the mental examination procedures in Utah Code Ann. § 77–14–4,[3] which are a prerequisite to an insanity plea, contravened his federal and state rights against self-incrimination.

¶5 The trial court rejected Herrera's arguments and upheld revised section 76–2–305, concluding that the statute does not violate due process or equal protection, nor does it relieve the State of its burden of proof. The trial court also ruled that the compelled examination statute does not offend rights against self-incrimination. The trial court, however, did not address Herrera's claims of cruel and unusual punishment, ruling instead that Herrera lacked standing to make such claims since he had not yet been convicted of any crime, let alone sentenced.

---

1. "[A] crime consists in the concurrence of prohibited conduct [the bad act] and a culpable mental state [the mens rea]." Charles E. Torcia, 1 *Wharton's Criminal Law* § 27, at 164–65 (15th ed.1993); *see also* Utah Code Ann. §§ 76–2–101 to –103 (1995) (requiring culpable mental state for imposition of criminal responsibility).

2. A statute may be unconstitutional either on its face or as applied to the facts of a given case. A facial challenge is the most difficult because it requires the challenger to "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). An as-applied challenge, on the other hand, succeeds if the challenger shows that the statute was applied to him or her in an unconstitutional manner. *Cf. In re Criminal Investigation*, 754 P.2d 633, 658–59 (Utah 1988); *see also* 1 *Sutherland's Statutory Construction* § 2.06 (5th ed.1994) (explaining that statutes may be unconstitutional as applied to facts of particular cases).

3. These procedures have been amended. The notice provision has been retained in section 77–14–4 (Supp.1998). The mental examination procedures are now found at Utah Code Ann. § 77–16a–301 (1995).

¶ 6 Herrera petitioned this court for interlocutory review, and in *State v. Herrera*, 895 P.2d 359 (Utah 1995) ("*Herrera I*"), we affirmed the trial court's rulings rejecting Herrera's arguments that the challenged statutes are facially unconstitutional. *See id.* at 363–69. In affirming the trial court's holding that section 77–14–4 did not violate Herrera's right against self-incrimination, we imposed certain restrictions on use of the information obtained from the mental examinations. *See id.* at 370–71. We also upheld the trial court's determination that Herrera lacked standing to assert his claims of cruel and unusual punishment. *See id.* at 371. Accordingly, we remanded Herrera's case for trial. *See id.*

¶ 7 Upon remand, Herrera's counsel arranged for Dr. Breck Lebegue, an expert forensic psychiatrist, to evaluate Herrera and assess his mental state at the time of the shootings. Dr. Lebegue had examined Herrera on several occasions immediately following the shootings and agreed to do so again. On the basis of all the examinations and his review of Herrera's mental health records, Dr. Lebegue submitted a report concluding that when Herrera killed Claudia, he lacked the mens rea for murder and therefore qualified for the insanity defense under revised section 76–2–305. Specifically, Dr. Lebegue found that Herrera suffered from Capgras Syndrome, a form of paranoid schizophrenia manifested by delusions of substitution and auditory hallucinations. Dr. Lebegue reported that Herrera's psychosis and delusional belief system led him to believe that the Mafia had replaced Claudia with a nonhuman double and, therefore, when he shot Claudia, "he believed he was killing a form that was not a human being." Dr. Lebegue also stated that Herrera probably would require confinement for life because his illness is lifelong and he is dangerous even when medicated.

¶ 8 In light of Dr. Lebegue's evaluations, the State stipulated that pursuant to revised section 76–2–305, Herrera was not guilty by reason of insanity of Claudia's murder because, when he shot her, he did not knowingly and intentionally cause the death of a human being and, thus, lacked the mens rea for murder. The trial court accepted the stipulated plea and, on October 17, 1996, entered its "Finding of Not Guilty By Reason of Insanity" as to the count of murder. The court ordered Herrera committed to the Utah State Hospital.[4]

¶ 9 In Dr. Lebegue's report, he also concluded that when Herrera shot at Rosa and Reuben, he knew they were human beings and intentionally tried to kill them; as a result, Herrera had the applicable mens rea for attempted murder and did not qualify for the insanity defense under revised section 76–2–305. Dr. Lebegue noted, however, that under the earlier version of section 76–2–305, Herrera would have qualified for an insanity defense with respect to the attempted murders because, although he knew the wrongfulness of killing human beings—which he admittedly believed Rosa and Reuben to be—he lacked the capacity to conform his conduct to the law due to his psychotic thinking at the time.

¶ 10 Relying on Dr. Lebegue's report, Herrera renewed his motions before the trial court challenging the constitutionality of revised section 76–2–305, but this time he challenged the statute as it had been applied to him with respect to the attempted murders. Herrera asserted that the statute is unconstitutional because it deprives him of an insanity defense for acts committed when, due to mental disease, he lacked the capacity to conform his conduct to the law or, in other words, was subject to an irresistible impulse. The trial court denied Herrera's motions, ruling that his arguments were essentially the same as those rejected in *Herrera I.*

¶ 11 Subsequently, on October 17, 1996, pursuant to Utah Code Ann. §§ 77–16a–103 to –104,[5] Herrera entered conditional pleas of

---

4. Herrera's judgment of not guilty by reason of insanity for Claudia's murder and his resulting commitment to the state hospital for that act are not at issue in the present appeal.

5. Upon a plea and verdict of "guilty and mentally ill," the trial court imposes any sentence that could be imposed if the defendant were not mentally ill, but orders the defendant committed to the state hospital for care and treatment for no more than eighteen months, or until the defendant has reached maximum benefit, whichever occurs first. *See* Utah Code Ann. §§ 77–16a–104, –202.

guilty and mentally ill to the two counts of attempted murder. The conditional pleas reserved the right to challenge on appeal the constitutionality of the statutory scheme governing the insanity defense and the criminal liability of mentally ill offenders who do not qualify for the insanity defense. The trial court accepted Herrera's pleas and ordered him transferred from county jail to the state hospital pending his sentencing for the attempted murders.

¶ 12 In view of his forthcoming sentence, Herrera filed an additional motion requesting the trial court to declare Utah's statutory scheme pertaining to the conviction and incarceration of mentally ill offenders unconstitutional on grounds of cruel and unusual punishment. Herrera noted that his claims of cruel and unusual punishment were not addressed in *Herrera I* and that he now had standing to raise them given his guilty pleas to the counts of attempted murder and his pending sentencing for those crimes. In this motion, Herrera challenged the statutory scheme as applied to him and on its face. Herrera charged that the statutes, as applied, are cruel and unusual because they prescribe that he be punished criminally for the attempted murders even though he was mentally ill at the time of those attempts and, just moments beforehand, had committed an act for which he has been deemed legally insane. Herrera asserted that the shootings were all part of the same psychotic episode and that his conduct during that episode should not be dissected into blameless and blameworthy segments. Herrera also argued that the statutory scheme, on its face, is cruel and unusual because it imposes

criminal punishment based not on mental culpability, but on an offender's status as a mentally ill person.

¶ 13 The State contested both arguments. The State maintained that the attempted murders must be analyzed separately from the murder, notwithstanding the fact that they occurred only moments afterwards; in so analyzing them, it is undisputed that when Herrera shot at Rosa and Reuben, he knew they were human beings, intended to shoot them, and understood the wrongfulness of his conduct. Given this, the State argued, imposing criminal punishment on Herrera for the attempted murders is not cruel and unusual. The State also asserted that in light of Dr. Lebegue's determination that Herrera understood the wrongfulness of attempting to kill Rosa and Reuben, Herrera would be ineligible for an insanity defense even under the more encompassing *M'Naghten* standard followed by a majority of states.[6] The State emphasized that no court has ruled it cruel and unusual to criminally punish a defendant who is sane under that test. The State also posited that Herrera lacked standing to challenge Utah's statutory scheme on the basis that it unconstitutionally punishes individuals who did not know their acts were wrong.

¶ 14 On July 18, 1997, Herrera's motion was heard by the trial court. At that time, Herrera's counsel requested an evidentiary hearing concerning alleged inadequacies in the Utah State Prison's treatment of mentally ill inmates. Herrera's counsel described the evidence he would offer, if allowed, in support of the allegations about the prison.[7] The trial court, however, denied the request for an evidentiary hearing and rejected

6. The *M'Naghten* test permits a defense of insanity if, at the time of the prohibited act, the defendant was "laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know what he was doing was wrong." Wayne R. LaFave, *Substantive Criminal Law* 306, 311 (1987). The *M'Naghten* test does not extend the insanity defense to persons who were incapable of conforming their conduct to the law at the time of their crimes.

7. Herrera stated he would call witnesses who would testify to the following: that the prison lacked beds, training, and resources; that due to

manpower shortages, unqualified staff handle inmates at the prison psychiatric ward; that severely mentally ill inmates are regularly transferred to the general prison population; that such mentally ill inmates are frequently victims of violence and theft; that mentally ill inmates are not properly given their medications; that prison psychiatrists regularly terminate medication of mentally ill inmates, resulting in dramatic decompensation; that mentally ill inmates regularly are taken off their medication for no reason other than to test whether they are malingering, oftentimes resulting in serious decompensation; and that mentally ill inmates are victimized by abusive use of restraints.

Herrera's motion, ruling that it is not cruel and unusual to impose criminal punishment on Herrera for the attempted murders.

¶ 15 On August 11, 1997, the trial court entered the following conclusions of law on Herrera's various claims: (1) Herrera was not legally insane under revised section 76–2–305 when he shot at Rosa and Reuben because he had the requisite mens rea for attempted murder, nor was he insane under the traditional *M'Naghten* standard for insanity because he also understood the wrongful nature of his actions; (2) because Herrera knew the wrongfulness of his acts, he had no standing to challenge Utah's statutory scheme on the basis that it punishes individuals who were unable to appreciate the wrongful nature of their acts; (3) Herrera constitutionally may be punished for the attempted murders even though he was found not guilty by reason of insanity for Claudia's murder; (4) Herrera lacks standing to challenge the current treatment of mentally ill offenders at prison because he will spend at least eighteen months at the state hospital before being incarcerated there, and when Herrera eventually is transferred to prison, he may pursue legal remedies at that time, if necessary; (5) Herrera's eventual confinement in prison is not cruel and unusual in that it does not shock the moral sense; and (6) given that Herrera's other constitutional challenges were rejected in *Herrera I*, the statutory scheme is constitutional.

¶ 16 Having denied Herrera's claims, the trial court, on September 15, 1997, entered its judgment and sentenced Herrera for the two counts of attempted murder. Herrera received two concurrent terms of imprisonment of one to fifteen years, with credit for his nearly five and a half years of pretrial incarceration. Additionally, in accordance with its determination that Herrera was guilty and mentally ill, the court ordered Herrera committed to the Utah State Hospital pursuant to Utah Code Ann. § 77–16a–202(1)(b) for a period of eighteen months or until he reaches maximum benefit, whichever occurs first. The court provided that when

that period of commitment expires, it retains jurisdiction to recall the sentence and commitment and resentence Herrera. This appeal followed.

¶ 17 On appeal, Herrera challenges his conviction and sentence for the two counts of attempted murder. Herrera contends that the Utah statutory scheme limiting the insanity defense solely to negating the pertinent mens rea and allowing for the conviction and imprisonment of all mentally ill offenders who do not qualify for that narrow defense is unconstitutional. Herrera claims the statutory scheme, on its face and as applied, violates (1) federal due process, (2) federal equal protection, and (3) federal and state guarantees against cruel and unusual punishment. Herrera further challenges as violative of the Fifth Amendment right against self-incrimination the statutory requirement that a defendant asserting a defense of insanity submit to examination by State experts.[8]

## STANDARD OF REVIEW

¶ 18 This case presents questions of law, namely, whether the Utah statutory scheme governing the insanity defense and the treatment of mentally ill offenders conforms with various constitutional provisions, both state and federal. As such, we accord no deference to the trial court's rulings, but review them for correctness. *See State v. Gardner*, 947 P.2d 630, 632 (Utah 1997). In testing the constitutionality of legislation, however, we construe the legislation, to the extent possible, as being in compliance with the federal and state constitutions. *See State v. Mohi*, 901 P.2d 991, 995 (Utah 1995). Given the importance of not intruding into the legislative prerogative, we do not strike down legislation unless it clearly violates a constitutional provision. *See Herrera I*, 895 P.2d at 363. We resolve any reasonable doubts concerning legislation in favor of constitutionality. *See Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 920 (Utah 1993).

---

8. We note that Herrera's facial challenges to the statutory scheme at issue on grounds of federal due process, federal equal protection, and the federal right against self-incrimination have already been rejected by this court in *Herrera I*. Herrera raises them again to preserve all of his federal claims together in the record.

## ANALYSIS

¶ 19 Our prior decision in this matter, *Herrera I,* disposes of many of Herrera's current arguments. In that opinion, we rejected Herrera's contentions that revised section 76–2–305, on its face, violates federal due process and equal protection. *See* 895 P.2d at 363–69. We also held that the Fifth Amendment right against self-incrimination is not contravened by the statutory requirement that a defendant asserting an insanity defense be examined by State experts.[9] *See id.* at 369–71. We see no reason to alter our analysis of these issues; the trial court correctly denied these claims.

¶ 20 *Herrera I* also assists in disposing of Herrera's "as applied" due process and equal protection challenges. To succeed on these claims, Herrera must demonstrate that rights secured to him by the federal Due Process and Equal Protection Clauses have been violated by his conviction and sentence for the attempted murders. *Cf. In re Criminal Investigation,* 754 P.2d 633, 658–59 (Utah 1988); *see also* 1 *Sutherland's Statutory Construction* § 2.06 (5th ed.1994) (explaining that "as-applied" challenge is limited to statute's application to facts of case at hand). As shown below, however, in attempting to so demonstrate, Herrera largely relies on the same arguments rejected in *Herrera I,* and the new points Herrera does raise are without merit.

### I. DUE PROCESS

■ ¶ 21 The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The rights and principles protected by this clause include those that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), and those which are "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). *See also* Chester James Antieau & William J. Rich, 2 *Modern Constitutional Law* § 40.00, at 558–59 (2d ed.1997).

■ ¶ 22 In his "as applied" due process challenge, Herrera contends it is implicit in the concept of ordered liberty that criminal responsibility not be imposed on him for the attempted murders when, as a result of his mental illness at the time, he could not control his conduct. In other words, Herrera argues that it violates due process to convict and sentence him for conduct resulting from an irresistible impulse. This is the same argument presented in *Herrera I,* and our conclusion in that decision controls: there is no federal due process right to any particular insanity defense. *See* 895 P.2d at 364. In fact, the United States Supreme Court specifically has held that "adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.'" *Leland v. Oregon,* 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (quoting *Palko,* 302 U.S. at 325, 58 S.Ct. 149). Herrera fails to identify any constitutionally recognized liberty interest or other due process protection that secures to him the right to be found not guilty by reason of insanity when he knew Rosa and Reuben were humans and, nonetheless, intentionally tried to kill them.

¶ 23 Indeed, at least twenty-seven states employ an insanity standard—the *M'Naghten* test—which does not include the irresistible impulse defense but, rather, focuses on whether the offender knew the wrongful nature of his conduct.[10] *See Herrera I,* 895

9. In this appeal, Herrera merely repeats his prior assertions concerning the compelled mental examination procedures and fails to articulate how his rights against self-incrimination were in any way violated by those procedures as applied to him.

10. *See* Ala. Code Ann. § 13A–3–1 (1994); Ariz. Rev.Stat. Ann. § 13–502(A) (West Supp.1998); Cal.Penal Code § 25(b) (West 1988); Del.Code Ann. tit. 11, § 401(a) (1995); *Morgan v. State,* 639 So.2d 6, 12 (Fla.1994) (stating irresistible impulse is not a defense in Florida); *Cruse v. State,* 588 So.2d 983, 989 n. 4 (Fla.1991) (stating *M'Naghten* standard as sole test for insanity), *cert. denied,* 504 U.S. 976, 112 S.Ct. 2949, 119 L.Ed.2d 572 (1992); 720 Ill. Comp. Stat. Ann. § 5/6–2(a) (West Supp.1998); Ind.Code Ann. § 35–41–3–6(a) (Michie 1994); *Baird v. State,* 688 N.E.2d 911, 915 (Ind.1997) (explaining that irresistible impulse test has been abolished in Indiana), *cert. denied,* 525 U.S. 849, 119 S.Ct.

P.2d at 363 n. 1 (citing LaFave, *Substantive Criminal Law* at 311). All federal courts likewise follow the *M'Naghten* standard.[11] Here, according to Dr. Lebegue's uncontroverted conclusions, Herrera understood the wrongful nature of his actions when he attempted to kill Rosa and Reuben. Thus, at least thirty-two jurisdictions other than Utah, including the twenty-seven states mentioned, all federal courts, and the four states with a mens rea standard of insanity similar to Utah's,[12] would permit Herrera to be convicted for the attempted murders.

¶ 24 Herrera nevertheless argues that it offends due process to treat him as legally insane in committing one act and legally sane in committing other acts seconds later. This argument is unpersuasive. Herrera again identifies no due process protection implicated by such a compartmentalization, nor does he show in any way how the concept of ordered liberty is breached by the determination that he was legally insane for one act and legally sane shortly thereafter for other acts. In fact, as discussed below in reference to Herrera's equal protection concerns, such lines must be drawn for purposes of determining criminal responsibility. In short, federal due process does not entitle Herrera to a judgment of not guilty by reason of insanity for the attempted murders simply because he was unable to control himself when he shot at Rosa and Reuben.

## II. EQUAL PROTECTION

¶ 25 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provision requires that state laws treat similarly situated people alike unless a reasonable basis exists for treating them differently. *See Herrera I*, 895 P.2d at 368. Conversely, "persons in different circumstances should not be treated as if their circumstances were the same." *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984).

¶ 26 In contending that his rights of equal protection have been violated, Herrera raises the identical argument addressed in *Herrera I*, namely, that the statutory scheme improperly differentiates the criminality of equally mentally ill offenders based on the content of their delusions: whereas one offender, due to mental illness, may not perceive his or her victim to be human, another offender, equally "insane," may. *See Herrera I*, 895 P.2d at 368–69. Herrera asserts that there is no rational basis for exculpating the former but not the latter. Under the facts of this case, Herrera argues, it is improper to classify him as insane in killing Claudia and sane just moments later in attempting to kill Rosa and Reuben where, although he knew Rosa and Reuben were human, all of these acts were part of the same delusional episode. In so arguing, Herrera identifies no fundamental right or suspect classification; therefore, the statutes Herrera challenges need only be rationally related to a valid public purpose. *See Greenwood v. City of N. Salt Lake*, 817 P.2d 816, 820–21 (Utah 1991).

122, 142 L.Ed.2d 99 (1998); Iowa Code Ann. § 701.4 (West 1993); La.Rev.Stat. Ann. § 14:14 (West 1997); Me.Rev.Stat. Ann. tit. 17–A, § 39 (West Supp.1998); Minn.Stat. Ann. § 611.026 (1998); *Westbrook v. State*, 658 So.2d 847, 850 (Miss.1995) (upholding *M'Naghten* standard); Mo. Ann. Stat. § 562.086(1) (West Supp.1999); *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854, 874 (1989) (applying *M'Naghten* standard); *Miller v. State*, 112 Nev. 168, 911 P.2d 1183, 1185 (1996) (same); N.J. Stat. Ann. § 2C:4–1 (West 1995); N.Y. Penal Law § 40.15 (McKinney 1998); *State v. Myers*, 123 N.C.App. 189, 472 S.E.2d 598, 603 (1996); Ohio Rev.Code Ann. § 2901.01(A)(14) (Anderson 1996); Okla. Stat. Ann. tit. 21, § 152 (West 1983); 18 Pa. Cons. Stat. Ann. § 315(B) (West 1998); S.C.Code Ann. § 17–24–10 (Law.Co-op.1985); S.D. Codified Laws § 22–1–2(20) (Michie 1998); Tenn.Code Ann. § 39–11–501(a) (1997); Tex. Penal Code Ann. § 8.01(a) (West 1994); *Price v. Commonwealth*, 228 Va. 452, 323 S.E.2d 106, 110 (1984) (holding *M'Naghten* test governs); Wash. Rev. Code Ann. § 9A.12.010(1) (West 1988); *State v. Edmon*, 28 Wash.App. 98, 621 P.2d 1310, 1314–15 (1981) (stating irresistible impulse is no defense).

11. *See* 18 U.S.C. § 17 (1998).

12. *See* Alaska Stat. § 12.47.010 (Michie 1998); Idaho Code § 18–207 (1997); Kan. Stat. Ann. § 22–3220 (1995); Mont.Code Ann. § 46–14–102 (1997).

¶ 27 We dismiss Herrera's arguments for the same reasons elaborated in *Herrera I. See* 895 P.2d at 368–69. The legislature, in enacting the statutes governing the insanity defense and the treatment of mentally ill offenders, sought to advance a valid public purpose, i.e., to limit the scope of the insanity defense and reduce the number of criminally culpable offenders avoiding criminal punishment. *See id.* at 361; *see also Utah Legislative Survey—1983,* 1984 Utah L.Rev. 115, 151–56. With that aim, the legislature reasonably drew the line between two groups of offenders, those who did not comprehend that their victims were human and those who did:

> The offenders in the first group do not know that they are hurting or killing another person, while those in the second group do know. The first group makes no moral judgment, while the second group realizes that they are actually killing someone and therefore their actions come closer to the realm of criminality.
>
> . . . .
>
> It can be reasonably concluded that those who understand and appreciate the fact that they are killing another are more "culpable" than those whose delusions carry them even further away from reality.... [T]he legal standard of mental illness for purposes of criminal culpability is not constitutionally required to embrace all medical definitions of mental illness.

*Herrera,* 895 P.2d at 369 (citations and quotations omitted).

¶ 28 The process of assessing criminal responsibility inevitably draws lines dividing the legally sane from the legally insane:

> When a crime has been committed and the accused's insanity is in issue, a court must determine, by way of the pertinent legal yardstick, whether or not the accused had enough capacity to be deemed criminally responsible. A decision one way or the other must be made: The accused is criminally responsible or he is not criminally responsible; the accused is bad or he is sick; the accused should be punished or he should be hospitalized. In short, the accused is sane or he is insane; there is no in-between.

Charles E. Torcia, 2 *Wharton's Criminal Law* § 100, at 4 (15th ed.1994). In this sense, the orientation of the medical field differs entirely from the legal arena in that categorical judgments of a subject's moral blameworthiness need not be made. *See id.*

¶ 29 Here, the flaw in Herrera's argument is that it presupposes he was as mentally deranged when he attempted to kill Rosa and Reuben as when he killed Claudia. However, Dr. Lebegue—Herrera's own expert—determined that Herrera did not suffer from the same delusion or cognitive impairment in shooting at Rosa and Reuben, despite the close proximity in time to when he killed Claudia. In fact, Dr. Lebegue explained that making this distinction is not illogical:

> I conclude that because [Herrera] was apparently not delusional about the other two victims [Rosa and Reuben], he fails to qualify as so cognitively impaired by his psychotic thinking that he was unable to know the wrongfulness of attempted murder of human beings. However, control of [his] volitional behavior was substantially impaired by his psychotic behavior which flowed from psychotic thinking. Thus, it is not a logical contradiction to fail to meet the "negation of intent" [standard of Utah's revised insanity statute] and meet the "impaired volitional control" standard set by the ALI definition in place in Utah before 1983.

¶ 30 Under the facts of this case, therefore, classifying Herrera as legally insane one moment and legally sane moments later does not violate federal guarantees of equal protection. The trial court correctly upheld Herrera's conviction and sentence on equal protection grounds.

### III. CRUEL AND UNUSUAL PUNISHMENT

¶ 31 We now address Herrera's claims that the statutory scheme at issue, both on its face and as applied, violates federal and state guarantees against cruel and unusual punishment. Unlike the issues discussed above, *Herrera I* did not address any of Herrera's claims of cruel and unusual punishment. *See* 895 P.2d at 371.

¶ 32 The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The state counterpart to this protection is article I, section 9 of the Utah Constitution, which states: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor." Utah Const. art. I, § 9.

¶ 33 Under the Eighth Amendment,[13] "[a] criminal punishment may be cruel and unusual when it is barbaric, excessive, or disproportional to the offense committed." State v. Mace, 921 P.2d 1372, 1377 (Utah 1996) (footnote omitted). Similarly, under article I, section 9 of the Utah Constitution, a criminal punishment is cruel and unusual if the punishment is so disproportionate to the offense committed that it "shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances." State v. Gardner, 947 P.2d 630, 633 (Utah 1997) (quotes omitted); see also State v. Copeland, 765 P.2d 1266, 1270 (Utah 1988) (same standard).

¶ 34 Herrera challenges the statutory scheme at issue both facially and as applied to him under the Eighth Amendment and article I, section 9. Consistent with our approach in prior cases, we first address Herrera's as-applied contentions. See, e.g., Mace, 921 P.2d at 1376–77. In so doing, we will address Herrera's arguments under the state constitution before proceeding to the federal analysis.

*A. As–Applied Challenge under Article I, Section 9 of the Utah Constitution*

¶ 35 Herrera claims that the sentence he received for the attempted murders under the statutory scheme at issue is cruel and unusual. Under revised section 76–2–305(1), Herrera did not qualify as legally insane for the two counts of attempted murder because it is undisputed that he pos-

sessed the applicable criminal mens rea when he attempted to kill Rosa and Reuben. Under Utah Code Ann. §§ 77–16a–103 to –202 (1995), Herrera received two concurrent sentences of one to fifteen years of imprisonment for the attempted murders and was committed to the state hospital for up to the first eighteen months of those sentences.

¶ 36 Herrera asserts that under article I, section 9 of the Utah Constitution, it is cruel and unusual and constitutes unnecessary rigor to impose any criminal punishment on him for the attempted murders. Herrera contends that this issue must be determined in light of evolving notions of decency and human dignity. In view of such notions, Herrera maintains he should not be sentenced to prison because (1) he "was so profoundly ill at the time" of the attempts, (2) imprisoning him serves no legitimate penological goals, and (3) imprisonment is disproportionate to his acts.

¶ 37 Herrera, however, presents no compelling reason for us to depart from our holding in *Mace*, 921 P.2d at 1378. In *Mace*, the defendant faced charges of rape and aggravated robbery. Like Herrera, Mace did not qualify for the insanity defense because the expert who evaluated him determined that he had the mens rea for the crimes. See *id.* at 1374–75. The expert concluded that Mace knew his conduct was wrong but, as a result of his mental disorder, was unable to conform his conduct to the law. See *id.* Mace entered a conditional plea of guilty and mentally ill and, on appeal, argued "that imposing *any* punishment on mentally ill but not legally insane offenders like himself is cruel and unusual." *Id.* at 1377 (emphasis in original). In response, we stated:

This court has already held that a defendant who does not qualify as legally insane under the Utah statutory scheme may be charged, tried, and convicted without offending state or federal due process and equal protection guarantees. It would be anomalous, if not irrational, for this court to hold . . . that the legislature can constitutionally hold such defendants accounta-

---

**13.** The Eighth Amendment prohibition of cruel and unusual punishment has been made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *See, e.g., Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

ble for their criminal conduct but cannot constitutionally impose any punishment on such defendants.

*Id.* (citation omitted). We then concluded that "absent a showing that a particular punishment is 'cruelly inhumane or disproportionate,' we are not apt to substitute our judgment for that of the legislature regarding the wisdom of a particular punishment or of an entire sentencing scheme." *Id.* at 1377–78 (citations omitted). Because Mace failed to show that his sentence was cruelly inhumane or disproportionate, we held that the punishment in that case was not cruel and unusual. *See id.* at 1378–79.

■ ¶ 38 Although *Mace* was decided under the Cruel and Unusual Punishment Clause of the United States Constitution, the principles announced in *Mace* apply with equal force to our consideration of Herrera's claims under the cruel and unusual punishment clause of the Utah Constitution. In response to Herrera's due process and equal protection challenges, we have already held that the legislature acted within federal and state constitutional bounds in distinguishing offenders' criminality on the basis of whether they had the applicable mens rea in committing their crimes. *See Herrera I*, 895 P.2d at 361–69; *see also supra* ¶¶ 21 through 29. From this distinction, it follows that an offender who acted with the applicable mens rea and was thus legally sane at the time of the crime may be punished criminally unless it is shown that the sentence itself is cruel and unusual. *See Mace*, 921 P.2d at 1377–78.

¶ 39 Like the defendant in *Mace*, Herrera fails to demonstrate that the punishment imposed on him is cruelly inhumane or disproportionate to the crimes committed. The undisputed evidence is that Herrera chased Rosa into her son's bedroom, took aim, and repeatedly fired his gun at both Rosa and Reuben at close range with the announced intention of killing them. Nothing in the record contradicts Dr. Lebegue's conclusions

that when Herrera attempted to kill Rosa and Reuben, he knew they were human beings—and thus did not suffer from the same cognitive impairment as when he killed Claudia—and he knew the wrongfulness of his actions. In light of this evidence, imposing two concurrent sentences of one to fifteen years, with credit for five and a half years of pretrial incarceration, is not cruelly inhumane or disproportionate to the crimes Herrera committed; the sentences, compared to the offenses, simply do not "shock the moral sense of all reasonable [people] as to what is right and proper under the circumstances." [14] *Copeland*, 765 P.2d at 1270 (quotes omitted). We therefore reject Herrera's claim that the sentences he received for the attempted murders of Rosa and Reuben are cruel and unusual under article I, section 9 of the Utah Constitution.

■ ¶ 40 Herrera nevertheless contends that it is cruel and unusual to incarcerate him in prison, where, he alleges, receipt of treatment for his mental illness is not guaranteed, the treatment that is rendered is oftentimes substandard, he is "likely to deteriorate" and not receive proper medication, and he is "likely to be victimized and abused by other prisoners" as a result of his mental illness. In making this argument, Herrera predominantly relies on the "unnecessary rigor" provision of the Utah Constitution: "Persons arrested or imprisoned shall not be treated with unnecessary rigor." [15] Utah Const. art. I, § 9. Herrera asserts that the inadequacies in treatment he will suffer if imprisoned constitute unnecessary abuse and, therefore, incarceration at the state prison violates the unnecessary rigor provision. *See Bott v. DeLand*, 922 P.2d 732, 740–41 (Utah 1996) (applying an "unnecessary abuse" standard in interpreting "unnecessary rigor" provision). Herrera submits that his continued confinement at the state hospital in

---

**14.** Herrera's pretrial incarceration spanned from June 6, 1991, through October 15, 1996—approximately five years and four months. Since he was given credit for this period, and since the fifteen-year sentences for the attempted murders are concurrent, the maximum period of imprisonment under Herrera's sentence is approximately nine years and eight months minus the

time he spends in the state hospital pursuant to his judgment of guilty and mentally ill under Utah Code Ann. § 77–16a–202(1)(b).

**15.** There is no federal counterpart to this provision of the Utah Constitution.

lieu of imprisonment is a more reasonable alternative.

¶ 41 Herrera has no standing to raise these claims; he is not yet imprisoned and may not be for some time. In challenging the conditions and treatment of mentally ill offenders at prison, Herrera relies on the proposed testimony of witnesses he claims would have supported his contentions if he had been allowed an evidentiary hearing on the matter. *See supra* note 7. The State, however, did not stipulate to or otherwise agree with the proposed testimony, and the trial judge denied Herrera's motion for an evidentiary hearing as follows:

> The issue of the prison's current policies governing the treatment and medication of schizophrenic inmates is not ripe for adjudication in the context of this case. The prison is undergoing various changes in its mental health policies and is subject to a federal consent decree. Defendant is not currently housed at the prison and may not be for eighteen months. Defendant, therefore, lacks standing to challenge the current prison policy or the treatment of prisoners other than himself.

██ ¶ 42 We agree with the trial court's reasoning. We have long held that one "may not allege jeopardy or injury to others in order to confer standing upon his own claims." *York v. Unqualified Washington County Elected Officials*, 714 P.2d 679, 680 (Utah 1986). Here, the "evidence" proposed by Herrera concerning treatment of mentally ill offenders at prison in the past does not confer upon him standing to speculatively challenge treatment he may or may not receive in the future when he eventually is imprisoned.

¶ 43 At this time, it is unknown when Herrera will actually be transferred to the state prison. Pursuant to his judgment of guilty and mentally ill, Herrera will spend the first part of his sentence for the attempted murders at the state hospital. *See* Utah Code Ann. § 77–16a–202(1)(b) (1995) (guilty and mentally ill offenders, before being im-

prisoned, are committed to state hospital for care and treatment for up to eighteen months). Here, the trial court ordered Herrera committed to the state hospital and provided that when that period of commitment expires, it retains jurisdiction to recall Herrera's sentence and commitment, and resentence him. *See id.* We are unwilling to conjecture as to when Herrera's period of commitment will expire, whether and in what manner the trial court will resentence Herrera, or, if and when Herrera eventually is transferred to prison, what the conditions and treatment of mentally ill inmates will be like at that time.

¶ 44 Our refusal to address Herrera's allegations concerning the conditions and treatment of mentally ill offenders at prison is consistent with our previously expressed reluctance to delve into problems arising out of internal prison administration, *see Wickham v. Fisher*, 629 P.2d 896, 901 (Utah 1981), and is particularly appropriate when, as the trial court noted, the state prison is undergoing changes in its treatment of mentally ill inmates and is subject to a federal consent decree requiring reform of its mental health facilities. Moreover, holding otherwise, and simply allowing Herrera to remain at the state hospital, would undermine the legislative determination that legally sane offenders should not avoid criminal responsibility for their acts.[16]

¶ 45 In sum, under article I, section 9 of the Utah Constitution, Herrera's sentence for the attempted murders is not cruel and unusual, and Herrera has no standing to challenge the prison's treatment of mentally ill offenders as unnecessarily rigorous. The trial court was correct in so ruling.

### B. As–Applied Challenge Under the Eighth Amendment to the United States Constitution

██ ¶ 46 We now turn to Herrera's claim that his punishment for the attempted murders is cruel and unusual under the Eighth Amendment. We note at the outset that the

---

16. Practically speaking, permitting Herrera to remain at the state hospital is akin to reversing the judgment against him for the attempted murders: had he been acquitted entirely of the at-

tempted murders, he still would have remained at the state hospital pursuant to his judgment of not guilty by reason of insanity for Claudia's murder.

analytical framework of what constitutes cruel and unusual punishment under the Eighth Amendment continues to evolve. While in the past the United States Supreme Court has applied a traditional proportionality analysis between the punishment and the crime, *see Solem v. Helm,* 463 U.S. 277, 286, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), two current Supreme Court justices have taken the position that the Eighth Amendment does not embody a proportionality requirement for sentences in noncapital cases, *see Harmelin v. Michigan,* 501 U.S. 957, 961–94, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of Scalia, J., joined by Rehnquist, C.J.), and three other justices would adopt a standard whereby sentences are stricken only if they are "grossly disproportionate" to the crime committed. *Id.* at 1001, 111 S.Ct. 2680 (opinion of Kennedy, J., joined by O'Connor, J., and Souter, J.); *see also Modern Constitutional Law* § 41.01, at 680–82. Nonetheless, the underlying jurisprudence of cruel and unusual punishments under the Eighth Amendment remains fundamentally the same: criminal punishments are prohibited if they are excessive or contravene evolving standards of decency and human dignity. *See Solem,* 463 U.S. at 292, 103 S.Ct. 3001; *State v. Gardner,* 947 P.2d 630, 649 (Utah 1997).

¶ 47 Under the Eighth Amendment, Herrera's sentence for the attempted murders is not cruel and unusual. First, the reasons already expressed for upholding Herrera's sentence under article I, section 9 of the Utah Constitution support the same conclusion under the Eighth Amendment ban on cruel and unusual punishments: Herrera's sentence is not cruelly inhumane, excessive, or disproportionate in any manner to the crimes he committed, and Herrera lacks standing to challenge the conditions and treatment of mentally ill offenders at the state prison.

¶ 48 Moreover, we believe that Utah's "guilty and mentally ill" statutory scheme, which prescribes that a qualifying offender such as Herrera serve the beginning of his sentence at the state hospital, *see* Utah Code Ann. § 77–16a–202(1)(b), "buffers some of the harsher consequences" of narrowing the insanity defense. *See Herrera I,* 895 P.2d at 367; *see also Mace,* 921 P.2d at 1378. Significantly, no court has struck down a "guilty and mentally ill" or "guilty but mentally ill" provision on Eighth Amendment grounds. *See* Debra T. Landis, *Guilty But Mentally Ill Statutes: Validity and Construction,* 71 A.L.R.4th 702, 707; *see, e.g., Neely v. Newton,* 149 F.3d 1074, 1082–83 (10th Cir.1998) (rejecting claim that imprisonment under "guilty but mentally ill" statute was cruel and unusual because no specific showing was made that prison provided inadequate treatment); *People v. Gindorf,* 159 Ill.App.3d 647, 111 Ill.Dec. 381, 512 N.E.2d 770, 780–82 (1987) (holding that "guilty but mentally ill" defendant may be imprisoned for life), *cert. denied,* 486 U.S. 1011, 108 S.Ct. 1743, 100 L.Ed.2d 206 (1988).

¶ 49 Furthermore, as explained earlier, because it is uncontroverted that Herrera knew the wrongfulness of his actions when he attempted to kill Rosa and Reuben, he would not qualify as insane even under the *M'Naghten* standard, which is followed by at least twenty-seven states and all federal courts. *See supra* notes 10–12 and accompanying text. As we stated in *Mace,* "[N]o court has ever ruled that punishing someone who fails to meet the M'Naghten test constitutes cruel and unusual punishment." 921 P.2d at 1378 (citations omitted). This continues to hold true today. We conclude, therefore, that Herrera's sentence for the attempted murders does not violate the Eighth Amendment guarantee against cruel and unusual punishment.

### C. Herrera's Facial Challenges to the Statutory Scheme at Issue

¶ 50 Herrera's final contention is that the statutory scheme at issue facially violates the Eighth Amendment to the United States Constitution and article I, section 9 of the Utah Constitution. Facial challenges succeed, however, only if the statutes at issue are incapable of any valid application. *See Greenwood v. City of North Salt Lake,* 817 P.2d 816, 819 (Utah 1991). Here, we have already upheld the challenged statutes as applied to Herrera; thus, his facial challenge fails a fortiori.

## CONCLUSION

¶ 51 For the foregoing reasons, Herrera's judgment and sentence for the two counts of attempted murder are affirmed.

¶ 52 Chief Justice HOWE and Justice ZIMMERMAN concur in Justice RUSSON's opinion.

DURHAM, Associate Chief Justice, dissenting:

¶ 53 For the reasons set forth in my dissent in *State v. Herrera*, 895 P.2d 359 (Utah 1995) (*Herrera I*), I dissent from the majority opinion herein.

STEWART, Justice, dissenting:

¶ 54 I dissent in today's opinion for the same reasons I dissented in *State v. Herrera*, 895 P.2d 359 (Utah 1995). For centuries the insanity defense has been recognized in Anglo–American law. *See id.* at 371 (Stewart, J., dissenting, joined by Durham, J.). That defense rests on the fundamental principle that human beings have free will and that society should punish only those capable of acting in a responsible manner—a concept that lies at the core of American civilization and its institutions of freedom. *See id.* at 372–74. Perhaps my view is provincial, but I submit that it is shocking and astonishing that this state, given its particular history and professed principles, and its Legislature and highest court, should undermine those principles.

¶ 55 Under Utah Code Ann. § 76–2–301(1), it makes no difference how deranged a defendant's mind may be—whether caused by chemical imbalances in the brain, organic brain disease, medications, or some other cause—as to whether he may be criminally punished. Of course, those with some status or influence in the community will be spared the harshest consequences. Those with no status or influence may not be spared.

¶ 56 Justice Felix Frankfurter of the United States Supreme Court wrote:

Ever since our ancestral common law emerged out of the darkness of its early barbaric days, it has been a postulate of Western civilization that the taking of life by the hand of an insane person is not murder.

*United States v. Baldi*, 344 U.S. 561, 570, 73 S.Ct. 391, 396, 97 L.Ed. 549 (1953), *quoted in Herrera I*, 895 P.2d at 371 (Stewart, J., dissenting, joined by Durham, J.).

¶ 57 I repeat what I said in my *Herrera I* dissent:

Today's majority opinion and the statute it sustains represent a monumental departure from, and rejection of, one of the most fundamental principles of Anglo–American criminal law that has existed for centuries. For the first time in this state's history, and, with two exceptions, for the first time in the nation's history, this Court now holds that an insane person who commits an act prohibited by the criminal law is as guilty as a sane person and may be imprisoned, and even executed, as if he were a fully responsible sane person. I submit that the Court fails to perceive the extent to which fundamental constitutional principles and values have been violated by its affirmance of Utah Code Ann. § 76–2–305(1). The decision flouts centuries-old legal principles of personal responsibility that evolved from Judeo–Christian moral and ethical concepts and from an expanding knowledge of the causes of human behavior. Basic precepts of state and federal due process of law, equal protection of the law, and the cruel and unusual punishment provisions in the state and federal constitutions prohibit legislative action imposing such inhuman treatment on persons whose mental faculties are so deranged that rational, morally responsible conduct is not possible.

*Herrera I*, 895 P.2d at 371–72 (Stewart, J., dissenting, joined by Durham, J.).

¶ 58 In the instant case, the majority goes to great lengths to show that defendant knew that what he was doing was wrong. Perhaps the Court is correct; however, because of the statute, defendant's conduct has been analyzed in an unrealistic manner. In any event, under the statute that this Court has now sustained, a person's knowledge of right and wrong and his or her ability to conform their conduct to those standards is irrelevant to a conviction. In essence, Utah law now

allows human beings to be dealt with as if they were wholly amoral robots.

¶ 59 In my view, there has never been an instance in the jurisprudential history of this state in which this Court has wandered so far from the moral principles embedded in the fundamental constitutional precepts established by the framers of our federal and state constitutions.