Justice DURHAM,
dissenting:
218 I disagree with the majority's conclusion that sentencing juveniles to life without the possibility of parole (LWOP) is not cruel and unusual under article I, section 9 of the Utah Constitution. In my view, the diminished culpability of juveniles, combined with the exceeding harshness and irreversible nature of LWOP, makes this sentence unconstitutionally disproportionate and inconsistent with the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).
I. UTAH'S CRUEL AND UNUSUAL PUNISHMENTS CLAUSE AND PROPORTIONAL SENTENCING
A. The Principle of Proportionality
«[ 214 Perhaps no theory of punishment is more foundational to a reasoned system of criminal justice than the maxim that the punishment must fit the crime. This venerable principle can be traced back to the Code of Hammurabi and the Mosaic codes found in the Old Testament. Code of Hammurabi § 196 (c. 1770 B.C.E.) ("If a man destroy the eye of another man, one shall destroy his eye."); Leviticus 24:20 ("Breach for breach, *114 eye for eye, tooth for tooth: as he hath caused a blemish in a man, so shall it be done to him again."); see Morris Raphael Cohen, Reason AanNp Law 58 (1950) ("But if ... an eye for an eye or a tooth for a tooth[ ] sounds too barbaric today, may we not ... put it thus: Everyone is to be punished alike in proportion to the gravity of his offense . ?"). The ancient Greeks and Romans also acknowledged punishments in a just society must be proportional to the crime. Plato, Laws bk. XI, at 984, in 5 The Dialogues of Plato 828 (B. Jowett trans., New York, MacMillan & Co.3d ed. 1892) (c. 850 B.C.E.) ("[Thhe law, like a good archer, should aim at the right measure of punishment, and in all cases at the deserved punishment."); Cicero, De Offices bk. I, ch. XXV, at 91 (Walter Miller trans., Harvard Univ. Press 1997) (44 B.C.E.) ("We should take care also that the punishment shall not be out of proportion to the offense. ..."}.
1215 Consequently, "[the principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence." Solem v. Helm, 463 U.S. 277, 284, 103 S.Ct. 77 L.Ed.2d 637 (1988). Indeed, the Magna Carta of 1215 guaranteed rights to proportional punishment: "A free man shall not be [fined] for a trivial offence, except in accordance with the degree of the offence; and for a serious offence he shall be [fined] according to its gravity...." J.C. Hout, Macna Carta 457 (2d ed.1992). Blackstone later elaborated that "[the method ... of inflicting punishment ought always to be proportioned to the particular purpose it is meant to serve, and by no means to exceed it." 4 Williaam Brackstone, CommENTARIES "12; see also Thomas A. Balmer, Some Thoughts on Proportionality, 87 Or. L.Rev. 788, 787T-88 (2008). Thus, Blackstone reasoned that the application of a disproportionately severe punishment is a form of malpractice performed by the state:
It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the ultimum supplicium [the death penalty], to every case of difficulty. It is, it must be owned, much easier to extirpate than to amend mankind: yet that magistrate must be esteemed both a weak and a cruel surgeon, who cuts off every limb, which through ignorance or indolence he will not attempt to cure. It has been therefore ingeniously proposed, that in every state a scale of crimes should be formed, with a corresponding scale of punishments, descending from the greatest to the least. ...
4 Wiuuram BrackstoN®s, CoOMMENTARIES *17-*18 (footnote omitted).
1 216 The early settlers of the Utah Territory intended that the "deeply rooted" common law principle of proportional punishment be constitutionally protected. In 1849, residents of what would become the Utah Territory prepared a proposed state constitution guaranteeing that "[alll penalties and punishments shall be in proportion to the offence." Constitution or THs Stats or Deseret 10 (Kanesville, Orson Hyde 1849). Constitutional conventions held in 1856 and 1862 produced proposed state constitutions containing identical guarantees of proportional punishment. Constitution of the State of Deseret, Deseret News, April 2, 1856, at 30; Sen. Misc. Doc. No. 35-240, at 2, 4 (1858); H.R. Misc. Doc. No. 37-78, at 5 (1862).
1 217 The fundamental principle of proportional punishment was carried forward into Utah's eruel and unusual punishments clause. The draft constitutions of 1872 and 1882 and the state constitution adopted in 1895 replaced the more explicit guarantee of proportional punishment found in prior draft constitutions with language drawn from the Eighth Amendment of the U.S. Constitution: [1] "Ex *115 cessive bail shall not be required; excessive fines shall not be imposed; nor shall eruel and unusual punishments be inflicted." Urax Const. art. I, § 9; accord H.R. Misc. Doc. No. 42-165, at 5 (1872); Constrrurion oF THE State or 20 (Salt Lake City, DessrET News Co. 1882). The Supreme Court has long held that identical language found in the Eighth Amendment prohibits disproportionate punishments. Solem, 463 U.S. at 290, 103 S.Ct. 3001 ("[A] criminal sentence must be proportionate to the crime for which the defendant has been convict ed."); Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ("[I)t is a precept of justice that punishment for crime should be graduated and proportioned to offense."); O'Neil v. Vermont, 144 U.S. 323, 331-32, 339-40, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (Field, J., dissenting) (although the majority declined to address the issue of proportionality under the Eighth Amendment because it was not briefed and because the amendment had not yet been extended to the states, the dissent reasoned that the Eighth Amendment proseribes "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged").
1 218 Courts have cited two principal reasons for interpreting the text of the Eighth Amendment to guarantee proportional punishment. Some courts have held that the Eighth Amendment's explicit prohibitions of "[elxcessive bail" and "excessive fines" must extend to bar excessive terms of imprisonment as "cruel and unusual." Solem, 463 U.S. at 289, 103 S.Ct. 3001. Other courts have held that disproportionately harsh sentences are both "cruel" and "unusual" within the meaning of those terms. Weems, 217 U.S. at 364, 377, 30 S.Ct. 544 (A sentence of twelve years of "hard and painful labor" for making false entries in an official document was "cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation of the Bill of Rights, both on account of their degree and kind.").
{219 Other states that have similar eruel and unusual punishments clauses in their constitutions have interpreted this clause to protect against disproportionate sentences. See, e.g., McDonald v. Commonwealth, 173 Mass. 322, 53 N.E. 874, 875 (1899); In re Lynch, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921, 930 (1972). Although the interpretation given to similar or even identical language found in the federal Constitution or the constitutions of our sister states is not binding, we may look to these interpretations when construing Utah's Constitution. Soc'y of Separationists, Inc. v. Whitehead, 870 P.2d 916, 921 n. 6 (Utah 1993).
¶ 220 This court has also recognized that the cruel and unusual punishments clause of the Utah Constitution provides protections against disproportionate punishments similar to the safeguards provided by the Eighth Amendment. Thus, "[a] criminal punishment is cruel and unusual under article I, section 9 if it is so disproportionate to the offense committed that it shock{s] the moral sense of all reasonable men as to what is right and proper under the circumstances." State v. Lofferty, 2001 UT 19, ¶ 73, 20 P.3d 342 (second alteration in original) (internal quotation marks omitted). Given the deference we afford sentencing judges and the right of the legislature to mandate the maximum sentence for a given offense-so long as it does not stray beyond constitutional bounds-this type of individualized proportionality review is justifiably limited.
B. Utah's Cruel and Unusual Punish, ments Clause Prohibits Disproportionate Punishments
1221 In his concurring opinion, Justice Lee argues that we should abandon our case-law affirming that the eruel and unusual punishments clause of the Utah Constitution forbids disproportionate sentences. The concurrence asserts that both the text of this clause and the historical understanding of the *116 language adopted in the Utah Constitution point to a more limited understanding of "cruel and unusual punishments." Under this interpretation, the Utah Constitution bans methods of punishment that are barbaric, but does not prohibit an excessive application of an otherwise permissible mode of punishment.
[ 222 I, along with a majority of this court, disagree. The text of the cruel and unusual punishments clause demonstrates that disproportionate punishments-not just barbaric methods of punishment-are prohibited. Moreover, the historical understanding of the term "cruel and unusual punishments" at the time Utah adopted its constitution affirms, rather than detracts from, this reading of the text.
1. Text of Utah's Cruel and Unusual Punishments Clause
1223 Article I, section 9 of the Utah Constitution provides: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted." This section contains three parallel clauses. The first two clauses prohibit "[eJxcessive bail" and "excessive fines" and expressly incorporate the principle of proportionality. They require the amount of money a defendant. may be required to deposit in security to remain free, as well as the amount in fines that a convicted individual may be required to pay, to be commensurate with the crime. The third prohibition against "cruel and unusual punishments" does not contain an explicit reference to proportionality.
1224 Invoking the canon of independent meaning, the concurrence asserts that this structure indicates that the framers of the Utah Constitution intended to protect citizens from disproportionate fines, but not excessive prison sentences or the disproportionate application of the death penalty (both accepted methods of punishment in Utah). Swpra " § 158-65. This structural reading of article I, section 9, however, produces an unnatural and incongruous result. A more appropriate canon of construction to apply to a parallel list of items is that of noscitur a sociis, or "it is known from its associates," which "requires that the meaning of doubtful words or phrases be determined in the light of and take their character from associated words or phrases." Heathman v. Giles, 13 Utah 2d 368, 374 P.2d 839, 840 (1962) (internal quotation marks omitted). This concept of drawing meaning from the context of associated terms has been adopted by the United States Supreme Court in interpreting the nearly identical Eighth Amendment:
We have recognized that the Eighth Amendment imposes "parallel limitations" on bail, fines, and other punishments, and the text is explicit that bail and fines may not be excessive. It would be anomalous indeed if the lesser punishment of a fine and the greater punishment of death were both subject to proportionality analysis, but the intermediate punishment of imprisonment were not.
Solem, 463 U.S. at 289, 103 S.Ct. 3001 (citation omitted).
¶ 225 The mnoscitur a sociis canon is also more appropriate because of its long-standing application to this constitutional language. It was first used in Justice Field's influential 1892 dissent in O'Neil v. Vermont, where he reasoned: "The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted." 144 U.S. at 340, 12 S.Ct. 693 (quoted in Weems, 217 U.S. at 371, 30 S.Ct. 544). Because this canon was applied before Utah adopted article I, section 9, it is more appropriate to apply the moscitur a sociis canon to this constitutional provision.
1 226 The plain meaning of "cruel and unusual punishments" reinforces this structural interpretation. The concurrence looks to several nineteenth century definitions of the word "cruel" and argues that because none of these dictionary definitions expressly incorporate the concept of proportionality, Utah citizens would have understood "cruel" to exclude this notion. Supra ¶ 161. Under this logic, Utahns in 1895 would not have understood a death sentence imposed for a minor infraction such as public intoxication as a "cruel" punishment because the death penalty was not deemed to be an inherently barbarous penalty. This cannot be the case. The definition of "cruel" is broad enough to *117 include grossly disproportionate punish ments. Such punishments can be said to be "inhuman;" "destitute of pity, compassion or kindness;" or "hard-hearted." Webster's American Dictionary of the English Language 210 (8d ed. 1830) (defining "eruel"). As noted by the Indiana Supreme Court:
A contrary view leads to the astounding result that it is impossible to impose a cruel and unusual punishment so long as none of the old and discarded modes of punishment are used; and that there is no restriction upon the power of the legislative department, for example, to prescribe the death penalty by hanging for a misdemeanor, and that the courts would be compelled to impose the penalty. Yet such a punishment for such a crime would be considered extremely cruel and unusual by all right-mined people.
Cox v. State, 181 N.E. 469, 471 (Ind.1932) (internal quotation marks omitted).
2. Historical Understanding of "Cruel and Unusual Punishments"
227 The concurrence also argues that the framers of the Utah Constitution would not have understood article I, section 9's prohibition of "cruel and unusual punishments" to forbid disproportionate punishments. Supra 11166-67. Most of the historical evidence cited by the concurrence, however, merely supports the conclusion that this phrase was traditionally understood to imcelude barbaric modes of punishment. This evidence does not advance the theory advocated by the concurrence: that the term "cruel and unusual punishments" traditionally excluded eruelly disproportionate applications of otherwise acceptable modes of punishment. A proper historical understanding of "cruel and unusual punishments" includes both the method and the severity of punishment imposed.
a. The English Bill of Rights
1228 As noted by the concurrence, supra 170, the language for Utah's cruel and unusual punishments clause originated in the English Bill of Rights of 1689, which provides "[that excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted," An Act Declaring the Rights and Liberties of the Subject and Setleing the Succession of the Crowne, in 6 Statutes or tHE® REALM 148 (1819). The concurrence also correctly notes that we may glean some understanding of the original meaning of "cruel and unusual punishments" from the Titus Oates case.
¶ 229 When King James II ascended to the throne, he had Oates tried for perjury for falsely accusing prominent English Catholics of organizing a "Popish Plot" to overthrow his brother, King Charles II. Harmelin v. Michigan, 501 U.S. 957, 969, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of Scalia, J.). These accusations resulted in the execution of fifteen individuals. Id. Oates was found guilty, and the court sentenced him to life imprisonment and to annually stand in pillory and be whipped through the streets of London. Id. at 970, 111 S.Ct. 2680. Shortly after James II was deposed in the Glorious Revolution of 1688 and the English Bill of Rights was passed, Oates petitioned the. House of Lords to overturn his sentence. Id. Even though the Lords considered the judgment of sentence to be "erroneous" and "exorbitant," a majority of the House of Lords declined to overturn the sentence. 10 H.C. Jour. 249 (1689). Instead, the Lords deemed it sufficient to introduce a bill to "prevent ... like Judgments for the future." Id. Members of the House of Commons took up Oates's cause, however, and passed a bill urging the House of Lords to reconsider. Id. at 251.
¶ 230 The record of the proceedings before the House of Lords and the House of Commons reveals that the debate over Oates's fate was largely driven by the sectarian politics and prejudices of the time. Members of the House of Commons argued that Oates's conviction should be set aside as corrupt because the trial was called for by the recently deposed "Papist" King James II after "partial, corrupt, and unqualified Persons were returned, and served on Juries." Id. at 248. House Members also asserted that the Jesuit novices who gave testimony against Oates could not be trusted to honor their oaths as witnesses because their superiors would have instructed them to lie in order *118 "to discredit the Evidence of the Popish Plot; and disparage those Parliaments who had prosecuted it with so much Vigour." Id. The House of Commons further urged the House of Lords to consider whether denying Oates's petition would be "interpreted a great Step towards disavowing the Popish Plot," as it had already been understood by rival powers "beyond Sea," and to contemplate whether this tacit admission would "be so much for the Honour of our Nation, or our Religion." Id. at 247. Members of the House of Lords, on the other hand, seemed to view Oates and - his improbable conspiracy theories (including committing perjury "in other Matters" such as accusing the former Queen of conspiring to kill the King, "which nobody could believe of her") as something of an international embarrassment to be swept under the rug. Id. at 249. Although the Lords conceded that Oates's sentence was improper, they declined to reverse it, explaining that the Oates case "was a Matter of great Expectation: That the Eyes of all Hwrope were upon it: And that it would be the Occasion of great Censures, if he should be set up for a Witness again, without a full Examination of the whole Affair." Id.
1231 As noted by the concurrence, both members of the House of Commons and the dissenting Lords also proffered a legal argument for overturning Oates's sentence based upon the recently passed English Bill of Rights. Supro ¶ ¶ 176-77. Given the extent to which national and religious politics pervaded this debate, however, it is somewhat difficult to discern the degree to which these political concerns colored the legal reasoning found in the record. But the comments preserved in the legislative record undoubtably provide some insight into the original meaning of the prohibition against "cruel and unusual punishments" contained in the English Bill of Rights.
4 232 The dissenting Lords argued that the sentence imposed upon Oates should be overturned under the cruel and unusual punishments clause of the English Bill of Rights because there were "no Precedents to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury." 14 H.L. Jour. 228 (1689). Thus, they asserted that the judgment against Oates was "contrary to Law and ancient Practice, and therefore erroneous, and ought to be reversed." Id. Members of the House of Commons likewise decried the unprecedented nature of punishment, calling the sentence "illegal" and "against Law." 10 H.C. Jour. 247 (1689).
¶ 233 The lesson that the concurrence takes from these statements is that certain members of Parliament objected only to the illegal and unprecedented nature of Oates's sentence, and not the disproportionality of the punishment. Supra ¶ 177. But this is a false distinction. The punishments prescribed were unsupported by "Precedents" and were "contrary to Law and ancient Practice" because they exceeded the punishments previously meted out for similar crimes. As one legal commentator put it: "Titus Oates' Case demonstrates that the English Cruell and Unusuall Punishments Clause was originally understood to prohibit new punishments that were excessive in light of prior practice." John F. Stinneford, Rethinking Proportionality Under the Cruel and Unusual Punishments Clouse, 97 Va. L.Rev. 899, 937 (2011).
€234 This concern that Oates's sentence was cruel and unusual because it was unprecedented in its severity is reflected in the Parliamentary record. The dissenting Lords, who argued that Oates's sentence should have been overturned, asserted that the sentence was "barbarous, inhuman, and unchristian" because "there is no Precedents to warrant the Punishments of whipping and committing to Prison for Life, for the Crime of Perjury." 14 H.L. Jour. 228 (1689). Even the Lords in the majority, who affirmed Oates's sentence in order to prevent "so ill a Man" from serving as witness in the future, conceded that "there was not one Lord, but thought the Judgments erroneous, and was fully satisfied, That such an extravagant Judgment ought not to have been given, or a Punishment so exorbitant inflicted upon an English Subject." 10 H.C. Jour. 249 (1689) (first and second emphases added). Members of the House of Commons likewise described the sentence as "cruel and ignominious," "excessive," "severe and ex *119 traordinary," and "an extravagant Judgment"-all descriptions of the disproportionate nature of the sentence. Id. at 247, 248.
235 Thus the Parliamentary debates over the sentence of Titus Oates, which were conducted in the context of the recently passed English Bill of Rights, demonstrate an original understanding of "cruel and unusual punishments" that includes the concept of proportionality.
b. The understanding of the cruel and unusual punishments clause contempo-rancous to the adoption of the Utah Constitution
T236 Of course, the meaning assigned to "cruel and unusual punishments" in the English Bill of Rights does not control the question of what this phrase means in the context of the Utah Constitution. The relevant issue is what these words meant when our Constitution was drafted and ratified in 1895. The contemporaneous precedents of (1) the U.S. Supreme Court in examining the Eighth Amendment, which is nearly identical to the relevant language of article I, section 9 and (2) state supreme courts that examined similar constitutional clauses reveal that the phrase "cruel and unusual punishments" was generally interpreted in line with its plain meaning: that disproportionately harsh punishments were cruel and unusual punish ments.
(i) Contemporaneous U.S. Supreme Court precedent
T237 Although the majority of the U.S. Supreme Court did not squarely address the question of whether the Eighth Amendment prohibited disproportionately harsh punishments prior to the adoption of the Utah Constitution, Supreme Court precedent indicates that the Court had assumed that a disproportionately harsh sentence was a cruel and unusual sentence.
1238 The Court first addressed a proportional punishments argument under the Eighth Amendment in Pervear v. Massachusetts, 72 U.S. (5 Wall.) 475, 18 L.Ed. 608 (1866). The defendant in that case argued that his sentence of a fifty dollar fine and three months imprisonment at hard labor for the illegal sale of intoxicating liquors was "excessive, cruel, and unusual" under the Eighth Amendment. Id. at 479-80. The Court declined to resolve this claim because it held that the Eighth Amendment did not apply to state legislation. Id. The Court went on to opine, however, that even if the defendant could invoke the Eighth Amendment, the defendant's argument would fail on its merits because the sentence was not excessive: "We perceive nothing excessive, or cruel, or unusual in [the defendant's sen-tencel." Id. at 480. Thus, the Court implicitly recognized that excessive punishments may be cruel and unusual punishments.
1239 The concurrence, however, draws a different conclusion from this opinion. The concurrence focuses on the Court's subsequent observation that the objective of liquor licensing laws is "to protect the community against the manifold evils of intemperance" and that "[the mode adopted, of prohibiting under penalties the sale and keeping for sale of intoxicating liquors, without license, is the usual mode adopted in many, perhaps, all of the States. It is wholly within the discretion of State legislatures." Id. The concurrence interprets this language to mean that the "mode" of enforeing liquor licensing laws is completely within the discretion of the state legislature and could never be deemed eruel and unusual so long as the legislature does not employ inherently cruel methods of punishment. Supra ¶ 188 n. 33. This reading is unduly strained. There is no indication that when the Court stated that liquor licensing laws were "wholly within the discretion of State legislatures" that it was proclaiming the punishments imposed by a statute to be immune from constitutional review. Moreover, there is no textual justification for drawing a distinction between inherently eru-el methods of punishment and disproportionately cruel sentences such that the former is constitutionally prohibited while the latter is not.
¶ 240 In 1892, just three years before the Utah Constitution was ratified, the Supreme Court again addressed a challenge to the proportionality of a sentence under the Eighth Amendment. The defendant in O'Neil challenged a sentence amounting to *120 fifty-four years of imprisonment at hard labor for the unauthorized sale of intoxicating liquor as unconstitutionally excessive. 144 U.S. at 327, 339, 12 S.Ct. 693. Once again, the majority of the court declined to address a claim under the Eighth Amendment because it concluded that this amendment did not apply to punishments applied by the states. Id. at 331-32, 12 S.Ct. 693. Justice Field, however, authored a lengthy dissent in which he squarely addressed the issue, stating that the Cruel and Unusual Punishments Clause
is directed, not only against punishments of the character mentioned [the rack, thumb-serews, iron boots, and stretching of limbs], but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted.
Id. at 339-40, 12 S.Ct. 693. A separate dissenting opinion authored by Justice Harlan and joined by Justice Brewer expressed a similar view, declaring that a sentence of fifty-four years "inflicts punishment which, in view of the character of the offenses committed, must be deemed cruel and unusual." Id. at 371, 12 S.Ct. 693.
$241 For the purpose of the inquiry at issue here-the prevailing understanding of the phrase "cruel and unusual punishments" when the Utah Constitution was drafted and ratified in 1895-it is of little importance that the opinions of Justices Field, Harlan, and Brewer are not binding precedent. The unchallenged opinion of three Supreme Court justices that a disproportionate sentence is also a cruel and unusual sentence just three years before Utah adopted its constitution is convincing evidence of how contemporaries would have understood this phrase.
¶ 242 The U.S. Supreme Court case that the concurrence relies upon, Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878), does not contradict this understanding of "cruel and unusual punishments." See supra ¶ ¶ 197-99. The defendant in that case challenged the manner in which he was sentenced to be executed for first-degree murder in the Supreme Court of the Territory of Utah, arguing that the statutes in force at the time did not permit him to be executed by firing squad. People v. Wilkinson, 2 Utah 158, 160 (Utah Terr.1877). The territorial supreme court considered sua sponte whether the manner of carrying out the execution, "death by shooting," was cruel and unusual. Id. at 164. The court concluded that death by firing squad was not cruel and unusual because it was not an unusual method and it was not any less humane than other accepted forms of execution. Id. The U.S. Supreme Court granted certiorari and considered the same constitutional question. Wilkerson, 99 U.S. at 130. The Court conceded that "[dlifficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted." Id. at 135-36. It nonetheless concluded that, at minimum, "it is safe to affirm that punishments of torture ... are forbidden by" the Eighth Amendment. Id at 136. The Court, therefore, determined that the method of execution-firing squad-was constitutional because it was not in the vein of barbarous methods of execution sometimes used in the past, such as disembowelment or being burned alive. Id. at 135-36.
1 243 While Wilkerson and the preceding territorial opinion certainly affirm the principle that inherently eruel methods of punishment are proscribed by the Eighth Amendment, these opinions do not provide that this is the outer limit of the protections afforded by this amendment. The Court did not consider whether execution was a disproportionately harsh punishment for first-degree murder for the simple reason that this claim was never raised. Indeed, such an argument certainly would have been deemed frivolous in 1878.
(ii) Contemporaneous state supreme court precedent
1244 The preponderance of state courts that addressed the proportional punishments question under identical state constitutional provisions agreed with the reading of "cruel and unusual punishments" expressed by Justices Field, Harlan, and Brewer in O'Neil v. *121 Vermont. State courts that rendered opinions on this subject either prior to or soon after the Utah Constitution was drafted and ratified in 1895 indicated that disproportionate punishments may be unconstitutionally cruel and unusual. McDonald v. Commonwealth, 173 Mass. 322, 53 N.E. 874, 875 (1899) ("[Ilt is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offense as to constitute a eruel and unusual punishment [under the Massachusetts Constitution]."); State ex rel. Garvey v. Whitaker, 19 So. 457, 457, 459 (La 1896) (citing Justice Field's dissent in O'Neil v. Vermont and overturning a near six-year sentence for trespassing in a public park under Louisiana's cruel and unusual punishments clause because of the severity of the punishment); People v. Whitney, 105 Mich. 622, 63 N.W. 765, 766 (1895) (noting that although "[ujpon the legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes," nevertheless "[iJt is true that cases might arise when the punishment imposed by an act is so eruel and unusual that the courts would interfere and protect the rights of the party"); In re MacDonald, 4 Wyo. 150, 33 P. 18, 20-21 (1893) (noting that a punishment is not "eruel or unusual" under the Wyoming constitution unless "the punishment provided by the law is so disproportionate to the offense as to shock the moral sense of the people" (internal quotation marks omitted)); State v. Becker, 3 S.D. 29, 51 N.W. 1018, 1022 (1892) (noting that a punishment may be set aside as unconstitutional "in very extreme cases, where the punishment proposed is so severe and out of proportion to the offense as to shock public sentiment and violate the judgment of reasonable people"); State v. Four Jugs of Intoxicating Liquor, 58 Vt. 140, 2 A. 586, 593 (1886) (rejecting a claim that the aggregate prison sentence for numerous separate offenses constituted a cruel and unusual punishment, but conceding that "[ilf the penalty were unreasonably severe for a single offense, the constitutional question might be urged"); State v. Driver, 78 N.C. 423, 426, 430 (1878) (overturning a sentence of imprisonment of five years and payment of a $500 security for assault and battery as unconsti-t ¢ tutionally "'excessive, cruel and unusual " because the sentence was "greater than [had] ever been prescribed or known or inflicted" for the same or similar offense).
245 The state cases cited by the concurrence do not significantly undermine these contemporaneous pronouncements that a disproportionate sentence may be a eruel and unusual sentence. The concurring opinion cites several older state opinions that state the general proposition that the severity of a sentence is left to the legislature. See Commonwealth v. Hitchings, 71 Mass. (5 Gray) 482, 486 (1855) ("The question whether the punishment is too severe, and disproportionate to the offence, is for the legislature to determine."); Barker v. People, 20 Johns. 457, 459 (N.Y.Sup.Ct.1823) ("[It was altogether discretionary in the legislature to extend [the punishment of disenfranchisement] to other offences."). These broad pronouncements that the legislature has the discretion to determine the severity of sentences do not directly lead to the conclusion that a sentence authorized by statute could never be unconstitutionally disproportionate. Indeed, courts in both Massachusetts and New York later announced that a disproportionately severe sentence could be set aside as cruel and unusual. McDonald v. Commonwealth, 53 N.E. at 875; In re Bayard, 63 How. Pr. 73, 77 (N.Y. Gen. Term 1881) (holding that "cruel and unusual punishments" may include "punishments so disproportioned to the offense as to shock the sense of the community").
[ 246 In a terse opinion, the Michigan Supreme Court also rejected a claim that a sentence was cruel and unusual by stating that "[uJpon the legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes." People v. Smith, 94 Mich. 644, 54 N.W. 487, 488 (1893). But just two years later the court clarified that the state legislature's power was not absolute. While acknowledging the legislature's authority to "fix the minimum and maximum of the punishment for all crimes," the court concluded that the legislative prerogative of determining the appropriate amount of punishment for a particular crime was limited by the cruel and unusual punishments clause of the Michigan Constitution: *122 "It is true that cases might arise when the punishment imposed by an act is so cruel and unusual that the courts would interfere and protect the rights of the party...." Whitney, 63 N.W. at 766.[2]
¶ 247 The concurrence cites several cases decided before Utah adopted its constitution that directly support the proposition that the phrase "cruel and unusual punishments" refers exclusively to the mode and not the degree of punishment. Supra ¶ ¶ 188-89. But these cases are of limited utility in determining the commonly understood meaning of this constitutional term, and they do not outweigh the Supreme Court and state precedent supporting proportionality review.
¶ 248 In Aldridge v. Commonwealth, 4 Va. (2 Va. Cas.) 447, 447-48 (Va.Gen.Ct.1824), a defendant challenged the constitutionality of a Virginia statute authorizing his punishment as a " 'free man of color'" convicted of larceny to be whipped with thirty-nine lashes, sold into slavery, and transported beyond the borders of the United States. The court denied the defendant's constitutional challenge, arguing that the Eighth Amendment was never intended to extend to slaves or "free blacks and mulattoes." Id. at 449. The court went on to opine in dicta, however, that the constitutional prohibition against cruel and unusual punishments "was never designed to control the Legislative right to determine ad libitum upon the adequacy of punishment, but is merely applicable to the modes of punishment." Id. at 449-50.
¶ 249 The reasoning of Aldridge, however, does not reflect the common understanding of "cruel and unusual punishments" and may best be explained by racial animus. Indeed, just four years later a Virginia court contradicted Aldridge In Commonwealth v. Wyatt, 27 Va. (6 Rand.) 694, 698 (Va.Gen.Ct.1828), the court examined a statute permitting a judge to sentence a person guilty of operating an illegal card game to be whipped any number of times, so long as only thirty-nine stripes were inflicted at a time. Addressing an argument that the statute permitted cruel and unusual punishments, the court concluded that the statute was not unconstitutional on its face, but suggested that sentencing judges were constitutionally restrained from sentencing an individual to an excessive number of stripes. Id. at 700-701.
¶ 250 Hobbs v. State, 133 Ind. 404, 32 N.E. 1019 (1893) is likewise of limited usefulness in determining the generally accepted meaning of "cruel and unusual punishments." In addressing a challenge to a prison sentence under the Indiana Constitution, that state's supreme court stated that it had not previously analyzed the eruel and unusual punishments clause in any depth. Id. at 1020. The court therefore cited Joseph Story's treatise for the proposition that the Cruel and Unusual Punishments Clause of the U.S. Constitution prohibits the violent methods of punishment that "had taken place in England in the arbitrary reigns of the Stuarts." Id. at *123 1021 (internal quotation marks omitted). The Indiana Supreme Court then took this thesis one step further and independently concluded that "cruel and unusual punishments" should be read to exclusively prohibit barbaric methods of punishment and that this language "does not affect legislation providing imprisonment for life or for years." Id. This holding, however, does not represent a common understanding of this constitutional language because the court did not cite any caselaw supporting this proposition. The Indiana Supreme Court came to this conclusion on its own. Indeed, the court seemed to be entirely unaware of the numerous cases holding that a disproportionate prison sentence could be an unconstitutionally eruel sentence. Supra ¶ 244.
8. Conclusion
1251 Under its plain meaning, "cruel and unusual punishments" includes disproportionately harsh punishments. And an examination of how this phase was understood in 1895 does not reveal an interpretation that diverges from this plain meaning. At minimum, however, this court should adhere to prior precedents where we have recognized that article I, section 9 of the Utah Constitution prohibits disproportionate sentences. See Lafferty, 2001 UT 19, ¶ 75, 20 P.3d 342; State v. Herrera, 1999 UT 64, ¶ 37, 993 P.2d 854. An identical interpretation has long been applied by federal courts to the Eighth Amendment. Weems, 217 U.S. at 377, 30 S.Ct. 544. In light of this long-standing interpretation given to identical language, we should not depart from our prior holdings because it is not "clearly convine[ing] that the rule was originally erroneous or is no longer sound because of changing conditions." State v. Menzies, 889 P.2d 393, 399 (Utah 1994) (internal quotation marks omitted).
II. PROPORTIONALITY OF JUVENILE LWOP
A. Proportionality in Relation to Juveniles as a Defined Class
T252 Because Utah has recognized that article I, section 9 of the Utah Constitution protects against disproportionately eruel and unusual punishments, I now examine whether sentencing a juvenile to LWOP violates this constitutional protection. As we have previously recognized in State v. Lofferty that "[al criminal punishment is cruel and unusual under article I, section 9 if it is so disproportionate to the offense committed that it shock{s] the moral sense of all reasonable men as to what is right and proper under the cireumstances." 2001 UT 19, ¶ 73, 20 P.3d 342 (second alteration in original) (internal quotation marks omitted). But an individualized proportionality review under the Lafferty standard is not the only kind of constitutional proportionality analysis. Article I, section 9 also requires courts to consider whether a particular punishment is unconstitutionally disproportionate when applied to a less culpable class of individuals-in this case, juveniles.
¶ 253 The Supreme Court has recognized that the Eighth Amendment embodies two distinct types of proportionality review. First, courts may determine that a sentence is unconstitutionally disproportionate, given all of the particular cireumstances of an individual case. Graham v. Florida, 560 U.S. 48, 59-60, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). This kind of review is similar to Utah's "shocks the conscience" standard. Second, the Court has recognized that certain sentences are categorically disproportionate when applied to a particular class of individuals. Id. at 60-61, 130 S.Ct. 2011; see also Roper v. Simmons, 543 U.S. 551, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (prohibiting the death penalty for juveniles); Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (prohibiting the death penalty for persons with mental disabilities). This second type of proportionality review does not evaluate a particular sentencing decision, but assesses whether a specific sentence may be applied to a group of individuals with a defining characteristic that makes members of that group less culpable than the general population. Graham, 560 U.S. at 61-62, 130 S.Ct. 2011.
¶ 254 A categorical proportionality analysis is likewise warranted under article I, section *124 9 of the Utah Constitution.[3] At least one other state has engaged in a similar class-based examination under its state constitution. Workman v. Commonwealth, 429 S.W.2d 374, 377-78 (Ky.1968) (holding that an LWOP sentence for rape categorically violated the Kentucky Constitution's ban on "cruel punishment" when applied to juveniles). And, as already noted, because Utah's cruel and unusual punishments clause is rooted in the Eighth Amendment, it is highly persuasive that the federal language has been interpreted to include such a categorical analysis.
11255 In conducting a categorical proportionality analysis, courts have addressed two questions: (1) whether "community consensus" favors or disfavors the application of a given penalty to a particular group and (2) whether that penalty is disproportionate based on a court's independent assessment. First, courts have asked whether statutory enactments or sentencing practices disfavor a particular punishment, indicating a consensus that the penalty is disproportionate when applied to a particular class. Graham, 560 U.S. at 66-67, 130 S.Ct. 2011 (finding a consensus against juvenile LWOP for nonhomicide offenses); Roper, 543 U.S. at 567, 125 S.Ct. 1183 (consensus against the death penalty for juveniles); Atkins, 536 U.S. at 316, 122 S.Ct. 2242 (consensus against the execution of persons with mental disabilities). In-dicia of society's disapproval of a punishment suggest the penalty is disproportionate and "unusual" under the Eighth Amendment. However, "[clommunity consensus, while entitled to great weight, is not itself determinative of whether a punishment is eruel and unusual." Graham, 560 U.S. at 67, 130 S.Ct. 2011 (internal quotation marks omitted). The ultimate responsibility for determining whether a punishment violates constitutional protections remains the province of the courts, which must exercise "independent judgment." Id. As the Nevada Supreme Court has noted:
More than any other provision in the Constitution the prohibition of eruel and unusual punishment depends largely, if not entirely, upon the humanitarian instinets of the judiciary. We have nothing to guide us in defining what is cruel and unusual apart from our consciences.... Our decision must necessarily spring from the mosaic of our beliefs, our backgrounds and the degree of our faith in the dignity of the human personality.
Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 947 (1989) (internal quotation marks omitted). "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." Graham, 560 U.S. at 67, 130 S.Ct. 2011.
B. Independent Assessment of the Proportionality of Juvenile LWOP
¶ 256 "To be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." Harmelin v. Michigan, 501 U.S. 957, 1023, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (White, J., dissenting); accord Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) ("[The punishment should fit the offender and not merely the crime."); United States v. Barker, 771 F.2d 1362, 1365 (9th Cir.1985) ("In each case, a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime."). The Supreme Court has recognized that certain categories of individuals, such as persons with mental disabilities and juveniles, must be treated differently when evaluating the constitutionality of a sentence because members of these classes are less culpable than other individuals.[4] Atkins, 536 *125 U.S. at 311, 317, 321, 122 S.Ct. 2242 (prohibiting the death penalty for persons with mental disabilities because of the reduced "relative culpability of mentally retarded offenders"); Roper, 543 U.S. at 571, 578, 125 S.Ct. 1183 (prohibiting the death penalty for juveniles because of their "diminished eulpa-bility"). In the context of offenders under the age of eighteen, "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." Miller v. Alabama, - U.S. -, 132 S.Ct. 2455, 2466, 183 L.Ed.2d 407 (2012).
T 257 In several recent cases, the Supreme Court has recognized that sentences appropriate for adult offenders may not be applied to juveniles. In Roper v. Simmons, the Court held that juveniles may not be subjected to the death penalty because it is "disproportionate punishment for offenders under 18." 543 U.S. at 575, 125 S.Ct. 1183. The Court subsequently held in Graham v. Florida that a juvenile could not be sentenced to LWOP for a nonhomicide crime. 560 U.S. at 82, 130 S.Ct. 2011. Finally, in Miller v. Alabama, the Court held that LWOP may not be imposed on a minor under a mandatory sentencing statute. - U.S. at -, 132 S.Ct. at 2469. The Miller Court explicitly declined to consider, however, whether the Eighth Amendment categorically bars an LWOP sentence for juveniles, leaving that question open under the federal constitution. Id.
1258 Roper, Graham, and Miller are founded upon the special circumstances of childhood that make juveniles less culpable and constitutionally different from adults. Miller, - U.S. at -, 132 S.Ct. at 2464 ("[C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform ... they are less deserving of the most severe punishments." (internal quotation marks omitted)); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult."). These cases rely upon three fundamental characteristics of juveniles that separate them from adults: (1) a lack of maturity, (2) a greater vulnerability to negative influences, and (8) the fact that a juvenile's character is less fixed than an adult. Miller, - U.S. at -, 132 S.Ct. at 2464. The mitigating characteristics of youth must also inform a proportionality analysis under the Utah Constitution.
1259 First, juveniles are less culpable because they exhibit "a lack of maturity and an underdeveloped sense of responsibility." Id. (internal quotation marks omitted). The underdeveloped nature of a juvenile's moral compass is not merely a matter of commonsense that "any parent knows"-it is rooted in the science of brain development. Id. (internal quotation marks omitted). Due to a lack of maturity, "'adolescents are overrepresented statistically in virtually every category of reckless behavior'" Roper, 543 U.S. at 569, 125 S.Ct. 1183 (quoting Jeffrey Ar-nett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339, 339 (1992)).[5] An adolescent's propensity for reckless and criminal activity is attributable, at least in part, to an underdeveloped brain: "[DJlevelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." Graham, 560 U.S. at 68, 130 S.Ct. 2011. "Scientists have found clear evidence that the brain *126 continues to mature through adolescence and into the early twenties, with large scale structural change taking place during this period in the frontal lobes, most importantly within the prefrontal cortex,.... [which] is central to ... advanced thinking processes that are employed in planning ahead and controlling impulses, and in weighing the costs and benefits of decisions before acting." EnizasEtH S. Scort & Laurence StemBErgq, RETHINKING JUVENILE JUSTICE 44 (2008); see also id. at 45 ("Recent studies show substantial changes during [adolescence and early adulthood] in brain regions and systems associated with impulse control, the calibration of risk and reward, and the regulation of emotions.").
1260 "In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent." Roper, 543 U.S. at 569, 125 S.Ct. 1183; accord Thompson, 487 U.S. at 823, 108 S.Ct. 2687 (plurality opinion) ("Examples of this distinction [between juveniles and adults] abound in our law: in contracts, in torts, in criminal law and procedure, in criminal sane-tions and rehabilitation, and in the right to vote and to hold office." (internal quotation marks omitted)). The same markers of immaturity underlying the denial of certain rights to juveniles that are enjoyed by adults support the conclusion that juveniles are comparatively less blameworthy for crimes they may commit. Thompson, 487 U.S. at 835, 108 S.Ct. 2687 (plurality opinion).
261 Second, juveniles are more vulnerable to negative influences and are generally unable to extricate themselves from crime-ridden environments. Roper, 543 U.S. at 569, 125 S.Ct. 1183. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). This susceptibility to negative influences is almost invariably coupled with a juvenile's inability to change his or her environment. Juveniles are dependent upon their parents or guardians for support and are unable to choose the neighborhood in which they live or, to great extent, the peers with whom they associate. ELIzABETH S. Scort & LaurENcE SremnBBro, REtuinkinc Juveniu® Justice 135 (2008). Nor do juveniles choose abusive, neglectful, or chaotic family lives that are all too often associated with criminal behavior in minors. Given their increased susceptibility to influences they cannot control, "juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." Roper, 543 U.S. at 570, 125 S.Ct. 1183.
262 Third, a juvenile's character is less fixed than an adult and is less likely to be mired in irretrievable depravity and psychological damage. Id. Studies have shown that a majority of juvenile offenders "age out" of criminal behavior as they mature into adulthood. Laurence Steinberg & Elizabeth S. Seott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. PsrcHonocaist 1009, 1014 (2003) ("For most teens, [antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood. ..."); Terrie E. Moffitt, Adolescence-Linmuited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy, 100 Psycroun Rav. 674, 675 (1998) ("The majority of erimi-nal offenders are teenagers; by the carly 20s, the number of active offenders decreases by over 50%, and by age 28, almost 85% of former delinquents desist from offending. ..."). Given the often fleeting nature of juvenile criminal tendencies, "[it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Roper, 543 U.S. at 573, 125 S.Ct. 1183. Because the adult who serves a life sentence will likely not be the same person who committed even a heinous crime while in their youth, juveniles are less deserving of the harsh sentence of LWOP.
*127 ¶ 263 The characteristics of youth that make juveniles less culpable than adults undermine the penological justifications for an LWOP sentence. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." Graham, 560 U.S. at 71, 130 S.Ct. 2011; accord Atkins, 536 U.S. at 318-20, 122 S.Ct. 2242 (the death penalty for persons with mental disabilities is excessive because it does not further legitimate penological goals). Thus, a penalty that does not adequately serve at least one of the legitimate social goals of punishment-rehabilitation, incapacitation, deterrence, and retribution-is nothing more than the "unnecessary and wanton infliction of pain" and violates Utah's cruel and unusual punishments clause. State v. Gardner, 947 P.2d 630, 634 (Utah 1997) (plurality opinion) (internal quotation marks omitted). Juvenile LWOP does not adequately further these traditional justifications for punishment.
264 LWOP serves no rehabilitative purpose, because the defendant will never be allowed to participate in society. Miller, - U.S. at -, 132 S.Ct. at 2465 ("Life without parole forswears altogether the rehabilitative ideal." (internal quotation marks omitted)), Indeed, individuals serving LWOP are often denied access to rehabilitation programs in prison for the simple reason they will never be released. Ashley Nellis, The Lives of Juvenile Lifers: Findings from a National Survey, Tus Sentencing 23-24 (Mar.2012), http://sentencingproject.org/doc/ publications/jj_The_Lives_of_Juvenile_ Lifers.pdf.
¶ 265 On the other hand, an LWOP sentence does serve the penological goal of incapacitating the individual from committing future erimes-at least outside of prison. The incapacitation rationale, however, is only valid if the confined individual would commit additional crimes but for his or her incarceration. "To justify life without parole [under an incapacitation theory] on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." Graham, 560 U.S. at 72, 130 S.Ct. 2011. As noted above, however, making a determination that an individual will always be a danger to society based on crimes committed while a juvenile is very difficult given the often transient nature of juvenile criminal tendencies. Supra ¶ 262. Absent reliable indicators that a juvenile will forever be dangerous, the goal of incapacitation is severely undermined.
T266 Juvenile LWOP likewise does not adequately serve the penological goal of deterrence. "Because juveniles lack of maturity and underdeveloped sense of responsibility . often result in impetuous and ill-considered actions and decisions, they are less likely to take a possible punishment into consideration when making decisions." Graham, 560 U.S. at 72, 130 S.Ct. 2011 (alteration in original) (citation omitted) (internal quotation marks omitted); see also Atkins, 536 U.S. at 319-20, 122 S.Ct. 2242 (the death penalty for persons with mental disabilities does not further the goal of deterrence because they often have a diminished ability to control their conduct based upon potential legal penalties). Thus, potential juvenile offenders are not likely to be deterred by the possibility of an LWOP sentence.
{267 The goal of retribution also does not justify juvenile LWOP. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." Tison v. Arizona, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Because juveniles are inherently less culpable than adults, "the case for retribution is not as strong with a minor as with an adult." Miller, - U.S. at -, 132 S.Ct. at 2465 (internal quotation marks omitted). Juveniles are less blameworthy because of their immaturity, susceptibility to negative influences they cannot control, and increased capacity to reform. Supra ¶ ¶ 259-62. This greatly weakens society's claim to retribution-especially where the punishment involves permanent incarceration. Thus, retribution is a weak justification for juvenile LWOP. Absent sufficient justification within any of the traditional rationales for punishment, juvenile LWOP constitutes the "unnecessary and wanton infliction of pain." See Gardner, 947 P.2d at 634 *128 (plurality opinion) (internal quotation marks omitted).
268 Finally, when conducting a constitutional proportionality analysis, courts must weigh the culpability of a particular class of individuals against the severity of the penalty. In this case, juveniles are not only less culpable than adults; an LWOP sentence is disproportionate because it is a harsher penalty for juveniles than it is for adults. LWOP sentences "share some characteristics with death sentences that are shared by no other sentence[ ]" because "[iJmprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable." Miller, - U.S. at -, 132 S.Ct. at 2466 (internal quotation marks omitted). An LWOP sentence for juveniles "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." Graham, 560 U.S. at 70, 130 S.Ct. 2011 (alteration in original) (internal quotation marks omitted). "Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." Id. An adult and a juvenile sentenced to LWOP "receive the same punishment in name only." Id.
269 Thus, in weighing the reduced culpability of juveniles against the severity of juvenile LWOP, I conclude such a sentence is unconstitutionally disproportionate under Utah's eruel and unusual punishments clause.
C. Community Consensus
1270 Although community consensus regarding a punishment is not determinative, it is relevant to an analysis of the constitutionality of juvenile LWOP. In gauging community consensus, the Supreme Court has looked to whether "objective indicia of society's standards, as expressed in legislative enactments and state practice, show a national consensus against a sentence for a particular class of offenders." Miller, - U.S. at -, 132 S.Ct. at 2470 (internal quotation marks omitted).
¶ 271 The first indication of society's standards-legislation regarding juvenile LWOP-is inconclusive. In a vast majority of states and in the federal criminal system, sentencing laws permit juvenile LWOP.[6] Graham, 560 U.S. at 62, 130 S.Ct. 2011 ("Six jurisdictions do not allow life without parole sentences for any juvenile offenders [as of 2010]."); State-By-State Legal Resource Guide, Univ. or S.F. Prossot to End Juvenile Life Without Parole (Nov. 28, 2012), https://www.usfea.edu/law/jIwop/resource._ guide/ (juvenile LWOP prohibited in eight states and the District of Columbia as of November 2012). Simply tallying the jurisdictions that permit or prohibit this penalty, however, "present[s] a distorted view." Miller, - US. at -, 132 S.Ct. at 2472. Most state legislation permitting juvenile LWOP does so only indirectly. Statutes typically authorize certain juveniles to be tried as adults and receive an adult sentence, but transfer statutes typically do not address whether a particular sentence is appropriate when applied to a juvenile.[7] Id. at -, 132 S.Ct. at 2472-73. Statutes that determine the conditions under which a juvenile may be *129 transferred to the adult criminal system tells us that the states considered the juvenile "to be old enough to be tried in criminal court for serious erimes (or too old to be dealt with effectively in juvenile court), but tells us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders." Thompson, 487 U.S. at 826 n. 24, 108 S.Ct. 2687 (plurality opinion). Thus, "the statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration." Graham, 560 U.S. at 67, 130 S.Ct. 2011.
¶ 272 In this case, the second consideration when measuring community consensus-fc-tual sentencing practices-provides a more definite indication of consensus. "Actual sentencing practices are an important part of [an] inquiry into consensus." Id. at 62, 130 S.Ct. 2011. Thus, even in jurisdictions where legislative enactments permit a particular penalty, infrequent imposition of the punishment may nonetheless indicate popular disapproval of the punishment. Id. (infrequent imposition of juvenile LWOP for nonhomicide crimes in jurisdictions where the penalty "is permitted by statute discloses a consensus against its use"); Roper, 543 U.S. at 567, 125 S.Ct. 1183 (infrequent imposition of the death penalty on juvenile offenders contributed to the Court's conclusion that society disapproved of the practice); Atkins, 536 U.S. at 316, 122 S.Ct. 2242 (infrequent imposition of the death penalty on persons with mental disabilities indicated community disapproval). A rarely imposed sentence may also indicate the punishment is "unusual" within the meaning of the constitutional ban on eruel and unusual punishments.[8] Atkins, 536 U.S. at 316, 122 S.Ct. 2242.
¶273 Thus, the extreme infrequency of a juvenile LWOP sentence in Utah indicates societal disapproval of the punishment and that the sentence is "unusual" within the meaning of Utah's ervel and unusual punishments clause. Indeed, prior to Mr. Houston receiving an LWOP sentence for a erime he committed while he was a juvenile, the punishment was more hypothetical than real. Mr. Houston is the only person serving a juvenile LWOP sentence in Utah. Juvenile Life Without Parole (JLWOP), Natu ConFERENCE oF Stats LEreistaturES 14 (Feb. 2010), http://www.nesl.org/documents/cj/ jlwopchart.pdf; State Distribution of Estimated 2,589 Juvenile Offenders Serving Juvenile Life Without Parol, HumaN RigHts Warcg (2004), http;//www.hrw.org/sites/ default/files/related_material/updatedJLWOP 10.09.pdf. And there is every indication that despite the fact that juvenile LWOP, as well as the death penalty before the Supreme Court declared it unconstitutional, has long been available through the juvenile transfer statute, Mr. Houston is the only juvenile offender to ever receive such a harsh sentence in Utah. Jesse Frubhwirth, To Die in Prison, StanparRbp-ExaminERr, May 6, 2007, at 1A. A sentence so rarely imposed despite its availability through legislative enactment demonstrates this punishment has never garnered wide-spread approval in Utah.[9]
€274 Finally, the international consensus against juvenile LWOP confirms my conclusion that this sentence is cruel and unusual. International consensus regarding a particular penalty may be relevant in determining whether the punishment is cruel and unusual. Roper, 543 U.S. at 575, 125 S.Ct. 1183 ([Alt least from the time of the Court's decision in Trop, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel *130 and unusual punishments.'"); Thompson, 487 U.S. at 830 n. 31, 108 S.Ct. 2687 (plurality opinion) ("We have previously recognized the relevance of the views of the international community in determining whether a punishment is eruel and unusual.").
1275 In the case of juvenile LWOP, the international consensus against the penalty is all but unanimous. The United States is the only country in the world that currently sentences juveniles to a life imprisonment with no chance of release. Connic de la Vega & Michelle Leighton, Sentencing Our Children to Die in Prison: Global Law and Practice, 42 U.S.F. L.Rev. 983, 989 (2008). Only ten other countries have laws illovving a juvenile LWOP sentence: Antigua and Barbuda, Argentina, Australia, Belize, Brunei, Cuba, Dominica, Saint Vincent and the Grenadines, the Solomon Islands, and Sri Lanka. Id. at 990. But researchers have been unable to identify any juveniles serving an LWOP sentence in these countries, indicating that, in practice, the United States is the only nation to actually impose irreversible life-long imprisonment on minors. Id. at 990, 1004-07.
276 International treaties confirm the international community's condemnation of juvenile LWOP. The U.N. Convention on Rights of the Child (CRC), adopted by almost every nation in the world, provides that "[n]either capital punishment nor life imprisonment without possibility of release shall be imposed for offences committed by persons below eighteen years of age." GA Res. 44/25, Annex, U.N. GAOR, 44th Sess., Supp. No. 49 at 167, U.N. Doc. A/44/49, at art. 37(a) (Nov. 20, 1989). The United States and Somalia are the only countries that have not ratified the CRC. Connie de la Vega & Michelle Leighton, Sentencing Our Children to Die in Prison: Global Law and Practice, 42 U.S.F. L.REv. 988, 1009 (2008); Lisa S. Yun, The United States Stands Alone: An International Consensus Against Juvenile Life Without Parole Sentences, 20 S. Cal. Interdisc. L.J. 727, 732 (2011); Jelani Jefferson & John W. Head, In Whose "Best Interests"?An International and Comparative Assessment of U.S. Rules on Sentencing of Juveniles, 1 Hum. Rts. & GLOBALIZATION L.REv. 89, 108 (2008).
D. Conclusion
1277 I agree with the majority's holding that Utah Rule of Criminal Procedure 22(e) requires this court to review Mr. Houston's unpreserved constitutional challenges to his sentence. I also agree with the majority that the cruel and unusual punishments clause of the Utah Constitution forbids disproportionate punishments-not just methods of punishment that are barbaric. Both this court's prior caselaw and an analysis of the text and history of this clause confirm that a disproportionate sentence may be both cruel and unusual.
¶ 278 I disagree, however, with the majority's conclusion that juvenile LWOP is not unconstitutionally disproportionate. Both the extreme infrequency of a juvenile LWOP sentence in Utah and global rejection of permanent incarceration for crimes committed before adulthood confirm my independent assessment that juvenile LWOP is cruel and unusual under the Utah Constitution. I would remand with instructions to administer the only other sentence available at the time of Mr. Houston's conviction: twenty years to life in prison. See Utah Code § 76-5-202(2) (2005); id. § 76-3-207(5)(a)-(c) (2005). Mr. Houston may well prove to be an irretriey-ably depraved individual, and a parole board may never deem him fit to rejoin society. Under this seenario, Mr. Houston would justifiably spend the rest of his days behind bars. I find it eruel and unusual, however, to make an irreversible determination that he should die in prison based upon even a heinous crime committed while he was a minor.[10] The special cirenmstances of youth, which make juveniles less blameworthy -and more capable of reform than adults, require the justice system to treat children differently.

. The 1872 draft constitution was modeled after the recently approved Nevada Constitution as part of the Utah Territory's ongoing efforts to obtain statehood despite national opposition to the practice of polygamy. Soc'y of Separationists, Inc. v. Whitehead, 870 P.2d 916, 928 n. 31 (Utah 1993) ("In 1872 the constitutional convention borrowed the constitution of Nevada as the basis for its proposed constitution." (internal quotation marks omitted)); see H.R. Misc. Doc. No. 42-165, at 4 (1872) ("The constitution of the proposed State, which is presented [to Congress] herewith, looks to the development of those improvements of political science which elsewhere excite public attention; for it will be observed that it provides for minority representation, impartial suffrage, and equal public educational facilities, without distinction of race, color, reli *115 gion, or citizenship.") The cruel and unusual punishments clause contained in the 1872 draft is identical to the corresponding clause found in the Nevada Constitution. Compare HR. Misc. Doc. No. 42-165, at 5 (1872), with Nev. Const. art. I, § 6. The language found in the Nevada Constitution was taken from the Eighth Amendment of the U.S. Constitution.

. The concurrence also cites a federal Ninth Circuit case, which states that "[the general rule is well settled that the sentence and punishment imposed upon a defendant for any violation of the provisions of the statute, which is within the punishment provided for by the statute, cannot be regarded as excessive, cruel, or unusual." Jackson v. United States, 102 F. 473, 487 (9th Cir.1900). But none of the cases cited by the Jackson court support the extreme proposition that a statute could never prescribe a cruel and unusual punishment. In Ligan v. State, 50 Tenn. (3 Heisk.) 159, 164 (1871), the court simply determined that the punishment was not cruel and unusual given the "character of acts" committed by the defendant and stated that it would "feel no hesitancy in enforcing sternly the penalties provided by the statute." Likewise, in Jones v. Territory, 4 Okla. 45, 43 P. 1072, 1074 (Okla.Terr.1896), the court noted that because there was nothing in the record from which the court could determine the defendant's age, "previous character," or "the circumstances under which the crime was committed," it could not "say, as a matter of law, that a sentence of 50 years in the territorial prison for the crime of manslaughter in the first degree is per se cruel and inhuman." Finally, as noted above, the remaining cases cited by the Jackson court-Pervear, 72 U.S. (5 Wall.) at 480; Becker, 51 N.W. at 1022; and Whitney, 63 N.W. at 766-actually support the proposition that courts may reverse a disproportionately cruel and unusual sentence authorized by statute. Supra ¶¶ 238, 244. Moreover, the claim made in Jackson that a sentence imposed pursuant to a statute can never be cruel or unusual is plainly wrong. Even under the interpretation of the cruel and unusual punishments clause advocated by the concurrence, a statute providing for a barbaric mode of punishment would be unconstitutional.

. In State v. Gardner, a plurality of this court reasoned that Utah's cruel and unusual punishments clause categorically prohibited the death penalty for the crime of aggravated assault while An prison. 947 P.2d 630, 645 (Utah 1997) (plurality opinion). A majority of the court, however, based its holding that the sentence was unconstitutionally disproportionate on the Eighth Amendment. Id. at 653 (Zimmerman, A.CJ., concurring).

. The law has also, for example, long recognized serious mental illness as a source of diminished capacity and tailored both concepts of culpability *125 and sentencing accordingly. See, e.g., Utah Code § 76-2-305(1)(b) ("Mental illness ... may be evidence in mitigation of the penalty in a capital felony ... and may be evidence of special mitigation reducing the level of a criminal homicide or attempted criminal homicide offense...."); Archuleta v. Galetka, 2011 UT 73, ¶ 95, 267 P.3d 232 ("[E]vidence of physical and sexual abuse and diminished mental capacities compose the kind of troubled history that may diminish moral culpability." (internal quotation marks omitted)).

. See also Jeffrey Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339, 343 ("Even when factors such as education, occupation, family size, and quality of home life are taken into account, the association of age with criminal behavior is preeminent. ...").

. Unlike interpretations of the United States Constitution, which affect laws promulgated by the state legislatures of all fifty states, when we address a Utah constitutional question, only Utah laws are implicated. When analyzing legislative enactments to gauge community consensus regarding a particular punishment, however, it is still appropriate to analyze laws from other states to gauge national consensus. Gardner, 947 P.2d at 640 (plurality opinion) (in evaluating the constitutionality of a punishment under a state constitutional provision, courts should compare "the challenged penalty with the punishments prescribed for the same offense in other jurisdictions " (internal quotation marks omitted)). Indeed, if we confined our analysis to Utah legislative enactments, this measure of community consensus would be circular and always favor the State because in order for a convict to challenge the constitutionality of a sentence, the Utah Legislature must have first authorized the punishment.

. Until recently, Utah was among the states that only permitted juvenile LWOP through its transfer statutes. See Utah Code §§ 78A-6-602(3), 78A-6-702. In 2013, however, the legislature amended the aggravated murder statute to specify that juvenile defendants are not subject to the death penalty, but may be sentenced to either twenty-five years to life or LWOP.2013 Utah ~ Laws 317. ‘

. The deterrent effect of an infrequently imposed sentence is also greatly reduced, undermining this justification for imposing the penalty in the first instance. See Furman v. Georgia, 408 U.S. 238, 311, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring) ("[The death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system.").

. After the publication of this opinion, the State provided this court with the records of one other Utah prisoner who had been sentenced to LWOP for a crime he committed two months before his eighteenth birthday. The existence of one additional person sentenced to LWOP for a crime he committed as a juvenile does not alter my conclusion that such a sentence is "unusual" within the meaning of article I, section 9 of the Utah Constitution.

. I note that the record is replete with evidence that Mr. Houston suffers from mental illness and the psychological damage created by a history of abuse and neglect. With the option of eventual release, his access to treatment and services would be enhanced, and perhaps, therefore, his ability and motivation to transform his life.